902 F.2d 273
 Harry PLYLER, et al., (Formerly Gary Wayne Nelson, et al.),
Plaintiffs-Appellees,
v.
Parker EVATT, Commissioner, South Carolina Department of
Corrections; Members of the South Carolina Board
of Corrections, Defendants-Appellants.
Harry PLYLER, et al., (Formerly Gary Wayne Nelson, et al.),
Plaintiffs-Appellees,
v.
Parker EVATT, Commissioner, South Carolina Department of
Corrections; Members of the South Carolina Board
of Corrections, Defendants-Appellants.
 Nos. 88-7763, 89-7601.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 7, 1989.
Decided May 7, 1990.
 
 Edwin Eugene Evans, Chief Deputy Atty. Gen. (Kenneth P. Woodington, Sr. Asst. Atty. Gen., on brief), Columbia, S.C., for defendants-appellants.
 Mary Malissa Burnette (Cynthia Hall Ouzts, on brief), Gergel, Burnette, Nickles, Grant & Ouzts, for plaintiffs-appellees.
 Before PHILLIPS and WILKINS, Circuit Judges, and SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 
 1
 The Commissioner of the South Carolina Department of Corrections and members of the South Carolina Board of Corrections (hereinafter collectively "SCDC") appeal from several rulings of the district court relating to an award of attorneys' fees in a class action suit under 42 U.S.C. Sec. 1983. Specifically, SCDC challenges (1) the hourly rates set for five of the twelve attorneys who represented the plaintiff class of prisoners; (2) the award of fees to plaintiffs' attorneys in some post-decree litigation, a portion of which the plaintiffs lost on appeal, see Plyler v. Evatt, 846 F.2d 208 (4th Cir.1988) (hereinafter Plyler I ); and (3) the district court's refusal to rule on whether to adjust downward the rates for attorney hours spent on "monitoring" activities. Finding no error in the district court's rulings, we affirm the award of attorneys' fees.I
 
 
 2
 In 1982, a class of South Carolina inmates brought a class action against SCDC under 42 U.S.C. Sec. 1983, complaining of overcrowded conditions in South Carolina prisons. In 1984, the State of South Carolina, through its General Assembly, sought to negotiate a settlement, citing its willingness to take necessary legislative action to appropriate funds for improvements to the prison system. In January 1985, a settlement agreement among all interested parties was signed, and the district court orally approved the agreement in November. In March 1986, the court issued a 167-page consent decree, outlining comprehensive reforms of South Carolina's prison system, to take effect in stages over the following five years. The decree covered virtually all aspects of prison conditions and life, providing among other things for improvements in staffing, medical care, and educational, vocational, and recreational programs. It further established requirements for construction of new prisons and renovation, and set minimum space requirements for single- and double-inmate cells.
 
 
 3
 Among its many provisions, the consent decree expressly provided that appellants pay all costs and reasonable attorneys' fees incurred during the litigation to date, in the subsequent monitoring of the decree, and--upon determination by the court--in post-decree litigation.[1] In August 1985, after the parties had reached their settlement agreement, the district court ordered an interim payment of fees in the amount of $100,000. As plaintiffs had not yet submitted their final fee request, the court reserved for later determination the question of the total fee award. Finally, during 1988, the court held three days of evidentiary hearings on plaintiffs' motion for attorneys' fees.
 
 
 4
 In an August 16, 1988, order, the court set out detailed findings on the fee and expense issues and awarded the plaintiffs' attorneys $414,721.91, less the $100,000 already paid. In computing the award, the court accepted some of SCDC's arguments for adjustments in the number of hours billed and largely applied the hourly rates for the plaintiffs' attorneys recommended by SCDC: five of the twelve lawyers received $65/hour, within the $50-$75/hour range urged by SCDC, and two lawyers received no fees at all. The court, however, awarded five of plaintiffs' lawyers hourly rates above the $50-$75/hour range. Two of those lawyers, Mary McClymont and Malissa Burnette, received $90/hour. Two others, Gaston Fairey and Steven Ney, received $100/hour. The fifth lawyer, Alvin Bronstein, received $150/hour.
 
 
 5
 Included in the court's award were fees for the attorneys' work in the post-decree litigation that led to Plyler I. That litigation arose when SCDC made a motion to modify the consent decree to accommodate an increase in prison population by allowing "double-celling" of inmates at some new prison facilities, in violation of express terms of the decree. The district court, rejecting the recommendations of a mediator and a federal magistrate, had denied the requested modifications and ordered immediate compliance with the decree. SCDC appealed some aspects of the district court's order, and we reversed. See Plyler I, 846 F.2d 208. We held (one judge dissenting) that the district court had abused its discretion in denying the modification and had clearly erred in finding that the harm to the prisoners of modifying the double-celling provision outweighed the risk to the public of a massive early release of prisoners. See id. at 212. We reasoned that "[a]lthough double-celling will be contrary to a specific term of the consent decree, the prisoners have received the essence of their bargain" because all other terms of the decree had been met, and, more significantly, "the general conditions of confinement now not only meet, but exceed constitutional requirements." Id. at 212-13. Plyler I was decided in April 1988. In its August 1988 attorneys' fees order, the district court allowed fees for the work on Plyler I, notwithstanding that the plaintiffs had not prevailed on the appeal of the double-celling issue, because the litigation was necessary to protect rights originally vindicated in the consent decree and involved issues "inextricably intermingled with the original claims in the lawsuit." Joint Appendix at 109 (quoting Willie M. v. Hunt, 732 F.2d 383, 386 (4th Cir.1984)).
 
 
 6
 In addition to setting the fee award, the district court's August 16 order declined to address whether the fees and costs for monitoring activities should be treated differently. In a February 21, 1989, order, it denied SCDC's motion to amend the findings of fact and conclusions of law in the August order to adjust fees and costs for monitoring. The court stated that it had "chose[n] not to change the existing procedure of processing fees for monitoring ... and felt it could not deal with that matter fairly at this time [and] that after more experience with the present system is had the issues in question may be revisited by the court upon the request of any of the parties." J.A. at 135-36.
 
 
 7
 SCDC then appealed both from the order awarding attorney's fees, specifically challenging the findings on five of the attorneys' hourly rates and the award of fees for work on Plyler I, and from the order denying its motion to amend the findings.
 
 II
 
 8
 We address first the two challenges to the award of fees.
 
 
 9
 * At the outset, we review briefly the relevant legal principles governing an award of attorneys' fees under 42 U.S.C. Sec. 1988, which provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." In calculating a reasonable fee under Sec. 1988, a court starts by multiplying the number of hours reasonably spent on the litigation times a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). As in this case, determination of the hourly rate will generally be the critical inquiry in setting the "reasonable fee," and the burden rests with the fee applicant to establish the reasonableness of a requested rate. Blum v. Stenson, 465 U.S. 886, 895-96 n. 11, 104 S.Ct. 1541, 1547-48 n. 11, 79 L.Ed.2d 891 (1984). In addition to the attorney's own affidavits, the fee applicant must produce satisfactory "specific evidence of the 'prevailing market rates in the relevant community' for the type of work for which he seeks an award." Spell v. McDaniel, 824 F.2d 1380, 1402 (4th Cir.1987) (quoting Blum, 465 U.S. at 895, 104 S.Ct. at 1547). Although the determination of a "market rate" in the legal profession is inherently problematic, as wide variations in skill and reputation render the usual laws of supply and demand largely inapplicable, see Blum, 465 U.S. at 895-96 n. 11, 104 S.Ct. at 1547-48 n. 11, the Court has nonetheless emphasized that market rate should guide the fee inquiry. Id.[2] Our review of the district court's award is sharply circumscribed; we have recognized that because a district court has "close and intimate knowledge of the efforts expended and the value of the services rendered, [the fee award] must not be overturned unless it is 'clearly wrong.' " McManama v. Lukhard, 616 F.2d 727, 729 (4th Cir.1980) (quoting Barber, 577 F.2d at 226), quoted in Spell, 824 F.2d at 1401.
 
 
 10
 SCDC challenges as clearly erroneous the hourly rates of five of the attorneys, claiming that these rates were not supported by evidence of customary or prevailing rates for civil rights and prison litigation in South Carolina, and hence did not reflect "market rates." In support of this argument, SCDC contends that the court failed to give adequate consideration to an affidavit identifying 145 cases in which civil rights attorneys in South Carolina were retained for between $50-75/hour and to a study by a state Advisory Committee on Associate Counsel that recommended rates of $50-65/hour when the state retains private counsel. The fee applicants, on the other hand, produced affidavits testifying to their own rates, experience, and skills as well as affidavits of South Carolina lawyers who were familiar both with the skills of some of the applicants and more generally with civil rights litigation in South Carolina. Though the evidence was conflicting, there was sufficient evidence of the prevailing market rates to support the hourly rates fixed by the district court for each of these five attorneys.[3] We review some of this evidence below.
 
 
 11
 Alvin Bronstein served in a limited consulting role in the litigation and his fee was based on a $150/hour rate. Bronstein has been Executive Director of the American Civil Liberties Union's National Prison Project since 1982 and is nationally and internationally recognized as a leading expert and practitioner in prison litigation. The district court did not err in fixing his rate at $150/hour in light of his vast experience and expertise, his testimony (and evidence of other fee awards showing) that his normal rate was $200, and the affidavit of John Harper, II, an expert on voting rights litigation in South Carolina, who testified that the prevailing rate for lawyers of his "qualifications and experience in comparable complex litigation range from $100 to $250" in South Carolina.
 
 
 12
 Gaston Fairey served as lead local counsel in the case beginning in 1982. He testified that during the pendency of the lawsuit, he billed other clients at a rate of $100/hour. In support of Fairey's application, D. Cravens Ravenel testified that he was familiar with litigation under Sec. 1983 in South Carolina and with Fairey's work, and he opined that an appropriate hourly rate in this case would be $125. Similarly, Terrell Glenn, a past president of both the Richland County and South Carolina bars, testified that based on his familiarity with prevailing rates in South Carolina, Fairey's rate should be at least $125, and "more likely" $150. In view of this evidence, the district court's determination that Fairey was entitled to $100/hour was not clearly erroneous.
 
 
 13
 Steven Ney served as lead counsel for the National Prison Project since 1981 and was, at the time of the case, Chief Staff Counsel for that organization. The district court awarded Ney $100/hour for his extensive work coordinating strategy among all lawyers, preparing complaints, conducting discovery, negotiating the settlement, and so on. Ney's own affidavit contained ample evidence of his wide experience in civil rights and prison litigation. In light of Ney's apparent expertise and the prevailing market rates as testified in the Ravenel and Glenn affidavits, the district court's rate for Ney was not clear error.
 
 
 14
 Malissa Burnette represented the attorneys in their motion for fees and was awarded $90/hour for this work. Her affidavit stated that at the time her customary billing rate was $90/hour and that that rate was in line with prevailing rates in South Carolina for partners' time. Burnette also produced the affidavits of Ann Furr and Jay Bender, lawyers in Columbia, South Carolina, who testified that based on their knowledge of prevailing rates in the community and of Burnette's work, an appropriate rate for Burnette's work in this case would be $90-$100/hour (Furr) or $90-$125/hour (Bender). In view of this evidence, we cannot say that the district court's $90/hour rate for Burnette was clearly erroneous.
 
 
 15
 Finally, Mary McClymont, a staff attorney with the National Prison Project, was also awarded $90/hour for her work, which began in 1986 and involved participation in counsel strategy meetings and negotiation over classification issues. Her affidavit testimony was that the National Prison Project regularly billed her work at $125/hour. Her affidavit also supports an inference that her experience and expertise in prison litigation was comparable to that of Steven Ney and that an hourly rate in the same range as his would be appropriate. In view of her qualifications and the other affidavits establishing the $90/hour rate she received as within market rates, we find no clear error as to the district court's award for McClymont.
 
 
 16
 In sum, we find no clear error in the district court's determinations of the five hourly rates challenged on appeal.
 
 B
 
 17
 SCDC next challenges the district court's award of fees for the attorneys' work in opposing SCDC's motion to modify the original consent decree to permit "double-celling" in undersized cells at certain prison facilities. SCDC contends that the plaintiff class was not a "prevailing party" in that post-decree litigation, and hence was not entitled to a fee award for the 182 hours spent on that litigation.[4] As noted above, though plaintiffs successfully opposed the motion to modify the decree in district court, we reversed the district court on those aspects of the court order that SCDC appealed. See Plyler v. Evatt, 846 F.2d 208 (4th Cir.1988) (Plyler I ). In addition, plaintiffs' petitions for rehearing by this court and for certioriari in the Supreme Court were both denied. SCDC does not dispute the plaintiffs' status as "prevailing party" in the underlying litigation that led to the 1986 consent decree; indeed, the decree itself embodied that basic entitlement to fees for that litigation. Nor does SCDC challenge plaintiffs' entitlement to reasonable monitoring fees, also provided for in the decree. Rather, SCDC contends that the litigation concerning the motion to modify, though obviously related to the underlying litigation, was so distinct and severable from it that a separate analysis of "prevailing party" under Sec. 1988 is warranted.
 
 
 18
 SCDC bases its argument on Willie M. v. Hunt, 732 F.2d 383 (4th Cir.1984). In Willie M., a class action brought on behalf of involuntarily committed, emotionally disturbed children resulted in a settlement that specified improvements in treatment and education programs at the facilities where the children were committed. During the implementation of the settlement's terms, two questions were raised about the scope of the plaintiff class. The parties could not resolve the dispute and litigation ensued. Both questions were ultimately answered adversely to the plaintiffs, one by an unappealed ruling of the district court, another by our reversal of a ruling favorable to the plaintiffs. See Willie M. v. Hunt, 657 F.2d 55 (4th Cir.1981). Though the attorneys for the plaintiffs had already received a fee award for work leading to the original settlement, they sought a second award for their ultimately unsuccessful work concerning the scope of the plaintiff class.
 
 
 19
 Reversing the district court, we denied this second fee award, reasoning that the litigation of the class definition questions involved issues and claims "distinctly different from" those in the original civil rights litigation. Willie M., 732 F.2d at 386. Our analysis was guided by the Supreme Court's pronouncements in Hensley v. Eckerhart, 461 U.S. 424, 434-35, 103 S.Ct. 1933, 1939-40, 76 L.Ed.2d 40 (1983):
 
 
 20
 In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants--often an institution and its officers ...--counsel's work on one claim will be unrelated to his work on another claim.... The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.
 
 
 21
 The questions of the scope of the plaintiff class as embodied in the settlement presented issues essentially of contract interpretation that were "not inextricably intermingled with the original claims in the lawsuit." Willie M., 732 F.2d at 386. We rejected the notion that the plaintiffs' attorneys had an ethical obligation to establish through litigation the scope of the plaintiff class, observing that "[a]ny duty to litigate arose ... from a failure on the part of counsel to formulate a consent judgment that clearly and unambiguously defined the plaintiff class." Id. at 386-87. Had the lawyers in Willie M. been "effective in formulating language that was self-executing," the litigation on which they did not prevail would never have arisen. Id. at 387.
 
 
 22
 As noted, SCDC does not dispute that at least as to work preceding the entry of the decree the plaintiffs had achieved "prevailing party" status; in other words, it is conceded that the plaintiffs had crossed the "threshold to a fee award of some kind" by effecting a "material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." Texas State Teachers Ass'n v. Garland Indep. School Dist., --- U.S. ----, ----, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). The question is whether the nature of the post-decree litigation warrants a separate analysis of the otherwise established "prevailing party" status. As our application of Hensley in Willie M. demonstrates, entitlement to fees for one aspect of a protracted litigation does not turn narrowly on whether the party prevailed on that particular matter, but whether a separate claim or, as here, a separate proceeding is so unrelated as to justify treating it as a "separate lawsuit[ ]." Hensley, 461 U.S. at 435, 103 S.Ct. at 1940. If treatment as a separate lawsuit is appropriate, then a party who may have "crossed the threshold" to become the "prevailing party" in the main action would in essence lose that status with respect to the separate claims or proceedings. The Supreme Court has directed district courts not to draw overly fine distinctions in making this determination. Certainly, where the issues presented in the later proceedings or in separate claims involve the same common core of facts or related legal theories, the case "cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Id. Ultimately, determinations of relatedness of claims and the quality of the overall results are not reached through application of any precise rules or formulae, but rather through an equitable judgment of the district court exercising discretion in light of the concerns expressed in Hensley. Id. at 436-37, 103 S.Ct. at 1941-42.
 
 
 23
 Here the district court acted within its discretion in ruling that the issues of Plyler I were so "inextricably intermingled with the original claims in the lawsuit," Willie M., 732 F.2d at 386, that severing those proceedings for a separate analysis of "prevailing party" status was not justified. As the district court noted, the plaintiffs' work in Plyler I was directed toward the protection of rights originally and unambigously vindicated in the consent decree. Cf. Turner v. Orr, 785 F.2d 1498, 1504 (11th Cir.1986) (attorneys' fees for litigation of some unsuccessful claims of violation of previously entered consent judgment recoverable under "prevailing party" language of 42 U.S.C. Sec. 2000e-5k in Title VII case). In Plyler I, SCDC had moved to modify an unambiguous provision prohibiting double-celling in cells of less than 100 feet, citing an unanticipated increase in the prison population. This modification pertained only to double-celling at five new facilities and did not challenge other aspects of the decree. Nonetheless, in holding that the modification should be allowed, we found it necessary to review and evaluate the full range of related reforms that were the objects of the original suit and were finally implemented by the terms of the consent decree. Our decision permitting the modification rested substantially on a judgment that the plaintiffs had received "the essence of their bargain" in that the general conditions now exceeded constitutional standards. Plyler I, 846 F.2d at 212-13.
 
 
 24
 In contrast to Willie M., where we found that certain deficiencies in the work-product of plaintiffs' counsel had necessitated their later unsuccessful effort to cure the deficiencies, the situation here is almost the exact opposite; here, plaintiffs' counsel, obviously successful in negotiating the consent decree, are not seeking to cure its revealed deficiencies, but to preserve its fruits. Plaintiff class had no option but to incur the related costs; plaintiffs' counsel were under clear obligation to make the defensive effort. See Ustrak v. Fairman, 851 F.2d 983, 990 (7th Cir.1988) (civil rights plaintiff was entitled to fees in connection with largely unsuccessful appellate defense because "he had no choice but to incur them or forfeit his victory in district court"). To deny attorney fees for such an effort, whether successful in detail or not, would obviously thwart the underlying purpose of the attorney fee provision of 42 U.S.C. Sec. 1988. For that reason and because the litigation in Plyler I involved comprehensive inquiry into "the significance of the overall relief claimed," Hensley, 461 U.S. at 435, 103 S.Ct. at 1940, the district court did not abuse its discretion or err as a matter of law in concluding that the matters at issue in Plyler I were so intertwined with the original claims that attorneys' fees for work on those proceedings should be awarded as to a still "prevailing party."
 
 
 25
 Our holding should not be construed as guaranteeing attorneys' fees after resolution of every dispute involving the consent decree. The initial status of "prevailing party" does not entitle appellees to compensation when resistance to modification is unsuccessful and the position taken was not essential to the preservation of the integrity of the consent decree as a whole.
 
 III
 
 26
 Finally, SCDC also challenges a February 21, 1989, order of the district court denying SCDC's motion to amend or supplement the findings and conclusions and to alter the judgment. Among other things, SCDC requested the court to rule that the attorney billing rate for monitoring activities should be limited to $60/hour. In its order denying SCDC's motion, the court stated that it had "chose[n] not to change the existing procedure of processing fees for monitoring[, that it] felt it could not deal with that matter fairly at this time[, and] that after more experience with the present system is had the issues in question may be revisited by the court upon the request of any of the parties." J.A. at 109. SCDC contends that the record before the court was sufficiently extensive to justify a ruling, and as that record is now before us, that we should rule on these matters in the first instance. We, however, find no abuse of discretion in the district court's denial of SCDC's motion and decline to address the merits of this question before the district court sees fit to do so.
 
 IV
 
 27
 The appellees have requested a determination that they are entitled to recover fees for their defense of this appeal. They are so entitled. See Hutto v. Finney, 437 U.S. 678, 693, 98 S.Ct. 2565, 2574, 57 L.Ed.2d 522 (1978); McManama v. Lukhard, 616 F.2d 727, 730 (4th Cir.1980); Ustrak v. Fairman, 851 F.2d 983, 990 (7th Cir.1988). Because related proceedings are pending in the district court, we remand the fee determination to the district court, see McManama, 616 F.2d at 730, rather than assess those fees ourselves, see Ustrak, 851 F.2d at 990.
 
 V
 
 28
 For the foregoing reasons, the orders of the district court are affirmed.
 
 AFFIRMED
 
 
 [1]
 Part III, Section V of the decree stated:
 Defendants shall pay Plaintiffs' counsel all costs and reasonable attorneys' fees incurred during the course of this litigation through the entry of this Decree by the Court and, upon submission of statements, incurred during Plaintiffs' monitoring of enforcement and compliance with this Decree. Plaintiffs' costs and attorneys' fees incurred in the submission of any dispute to the Court following the entry of this Decree shall be paid by Defendants upon the Court's determination that Plaintiffs are entitled to costs and fees.
 
 
 [2]
 This court and others have endorsed a multifactored test of reasonableness, taking account of:
 (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fee awards in similar cases.
 Spell, 824 F.2d at 1402 n. 18 (citing Barber v. Kimbrell's, 577 F.2d 216, 226 n. 28 (4th Cir.1978)); see Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974). Ultimately, though, a fee justified under this test might still be unreasonable if out of line with "market rates." Blum, 465 U.S. at 895, 104 S.Ct. at 1547.
 
 
 [3]
 It is noteworthy that the district court set the rates for five of the twelve attorneys within the $50-$75/hour range urged by SCDC, and awarded no fees for two of the attorneys' work. Those rulings are not before us
 
 
 [4]
 The entitlement to a fee award in post-decree litigation is governed by Part III, Sec. V of the consent decree, which states in relevant part: "Plaintiffs' costs and attorneys' fees incurred in the submission of any dispute to the Court following the entry of this Decree shall be paid by Defendants upon the Court's determination that Plaintiffs are entitled to costs and fees." As all agree, this language subsumes decisional law construing "prevailing party" under 42 U.S.C. Sec. 1988