953 F.2d 637
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Nathan COFFEY, individually and as representative of the
class of pretrial detainees and convicted prisoners who are
now, have been or will be incarcerated in the Wake County
Jail, Plaintiff-Appellant,
and
Harold Mial; James Joiner; Earl T. Morgan; Willie Earl
Jeter, both individually and as representatives of the class
of pretrial detainees and convicted prisoners who are now,
have been, or will be incarcerated in the Wake County Jail, Plaintiffs,
v.
WAKE COUNTY NORTH CAROLINA BOARD OF COMMISSIONERS; John H.
Baker, Sheriff of Wake County, Defendants-Appellees,
and
John T. Massey, Jr.; Larry B. Zieverink; Members of the
Wake County Board of Commissioners, individually and in
their official capacity; RONALD E. AVERY, Chief Jailer,
Wake County Jail; M. Edmund Aycock, Chairman of the Wake
County Board of Commissioners, individually and in his
official capacity; J. Steward Adcock; Robert B. Heater;
Veron Malone; G. Herbert Stout; Members of the Wake County
Board of Commissioners, individually and in their official
capacity, Defendants.
 No. 90-6691.
 United States Court of Appeals, Fourth Circuit.
 Argued June 3, 1991.
Decided Jan. 30, 1992.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Fox, Chief District Judge. (CA-85-1451-CRT-F)
 Argued: Gregory C. Malhoit, East Central Community Legal Services, Raleigh, N.C., for appellant; Michael R. Ferrell, Wake County Attorneys Office, Raleigh, N.C., for appellees.
 On Brief: Vasiliki A. Pistolis, East Central Community Legal Services, Richard E. Giroux, North Carolina Prisoner Legal Services, Raleigh, N.C., for appellant; Corinne G. Russell, Wake County Attorneys Office, John Maxfield, Wake County Sheriff's Department, Raleigh, N.C., for appellees.
 E.D.N.C.
 AFFIRMED.
 Before K.K. HALL and PHILLIPS, Circuit Judges, and THOMAS SELBY ELLIS, III, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 This appeal involves a dispute over entitlement to attorneys' fees under 42 U.S.C. § 1988. In January 1990, Coffey, individually and as representative of a certified class of pretrial detainees and convicted prisoners, filed a motion to compel Wake County[1] to comply with the parties' 1986 Consent Judgment, and a motion for contempt, alleging that the County had failed to comply with the Consent Judgment by allowing the Wake County Jail to remain overcrowded. Specifically, Coffey alleged that the County had not made "every reasonable effort" to relieve jail overcrowding, as required by the Consent Judgment. Settlement efforts under a magistrate judge's supervision foundered over a dispute over attorneys' fees. Thereafter, Coffey moved to dismiss his motions on the ground that after they were filed, the County took reasonable steps to relieve jail overcrowding. Coffey also petitioned the court for attorneys' fees, pursuant to 42 U.S.C. § 1988. The district court granted Coffey's motion to dismiss, but denied Coffey's petition for attorneys' fees and expenses, on the grounds that (i) the enforcement motions required interpretation rather than mere enforcement of the Consent Judgment, and (ii) Coffey was not the prevailing party in the enforcement proceeding. Coffey appeals. Finding no reversible error, we affirm.
 
 I.
 
 2
 In 1985, Coffey filed this class action on behalf of all past, present, and future inmates and pretrial detainees confined in the Wake County Jail. Coffey alleged that severe overcrowding and other conditions of confinement violated the Eighth and Fourteenth Amendments, as well as state statutory and regulatory requirements. Shortly after the litigation began, the parties entered into settlement negotiations. In the course of these negotiations, the County made a number of concessions, including authorizing the Sheriff to lease additional space for a larger weekend detention facility, known as "Center One." In light of these various concessions by the County, the parties entered into a Consent Judgment, requiring the County, in part, to grant the inmates access to exercise facilities and reading materials and to provide a law library for inmates. These matters were spelled out with precision. Less precise were two Consent Judgment provisions stating that the County would open Center One on weekends to house inmates and "make every reasonable effort" not to allow the population in the Wake County Jail to exceed the "desirable" level of 177 inmates.
 
 
 3
 As early as 1981, Wake County purchased property in recognition of the need to begin planning for a larger Wake County Jail ("Public Safety Center"). Even so, the County realized that a significant amount of time would pass before the Center could be planned, designed, and constructed. Accordingly, funds were authorized in October 1984 for a weekend jail facility to handle the typical increase in inmates on weekends. When the County realized that this facility would not accommodate the increase of inmates on weekends, Center One was constructed.
 
 
 4
 Even after the Consent Judgment was signed and Center One became operational, the County recognized that jail overcrowding would be a continuing problem. Thus, in addition to hiring a consulting firm and forming a committee to monitor the jail overcrowding situation, the County, in 1987, appropriated funds and found a location on which an additional satellite jail ("Hammond Road Annex") could be constructed, pending the scheduled July 1991 completion of the Public Safety Center. The Hammond Road Annex opened in June 1988, doubling the number of beds available to house full-time inmates.
 
 
 5
 Continued overcrowding at the main Wake County Jail caused the County, during the fall of 1989, to explore additional ways to alleviate the problem. One of these, expansion of the Center One weekend facility to full-time use, was unsuccessful because the city fire code required leaving the exit doors at Center One unlocked, resulting in inadequate security.[2] Other efforts were somewhat more successful. For example, the County agreed to make greater use of "Re-Entry," the pre-trial release program, and thus reduce the number of pre-trial detainees. In addition, the County discussed implementing a Home Detention Program[3] and the District Attorney's "Free the People" program.[4] During this period, the County and the Sheriff also discussed staffing requirements for the Public Safety Center. These discussions were in preparation for the County budget for fiscal year 1990-91 to be approved by the Board in June 1990.
 
 
 6
 Despite continuing efforts by the County to accommodate the growing inmate population, the Wake County Jail's overnight population exceeded 177 inmates eighty-five percent of the time between July 1989 and December 1989. Given this, Coffey's attorneys wrote the County in November 1989, expressing their opinion that the County was violating the Consent Judgment. Counsel for Coffey also advised the County that they intended to file enforcement litigation. Following Coffey's filing of the motions to compel and for contempt on January 17, 1990, the district judge ordered a magistrate to oversee settlement negotiations. During settlement discussions, the County outlined the steps it had taken and intended to take in the forthcoming budget year to solve the overcrowding problem. At the final meeting between the parties and the magistrate, Coffey's counsel raised the issue of attorneys' fees. The County refused to pay attorneys' fees and the settlement discussions ended. Following this, Coffey moved to dismiss his motions to compel and for contempt on the ground that the County had made reasonable efforts to solve the overcrowding problem subsequent to his filing of the motions.[5] Counsel for Coffey also petitioned the district court for an award of attorneys' fees, pursuant to 42 U.S.C. § 1988.[6] The district court granted Coffey's motion to dismiss, but denied the motion for attorneys' fees. Coffey v. Wake County Bd. of Comm'r, No. CA-85-1451-CRT-F (E.D.N.C. Oct. 3, 1990).
 
 
 7
 Coffey appeals the district court's denial of attorneys' fees, arguing that the district court incorrectly found (i) that the motions to compel and for contempt required interpretation rather than enforcement and (ii) that the County's ameliorating actions were not prompted or caused by Coffey's motions.
 
 II.
 
 8
 The threshold question is whether the district court correctly found that Coffey's enforcement motions called for interpretation of the Consent Judgment rather than for its enforcement. This question is pivotal, for if the motions are found to be for enforcement, then the proceeding would share common facts and legal theories with the underlying litigation, and Coffey would be entitled to retain his previously acquired prevailing party status. Retaining such status entitles a party to an award of attorneys' fees upon a district court's finding of reasonableness. See Plyler v. Evatt, 902 F.2d 273, 281 (4th Cir.1990); Hensley v. Eckerhart, 461 U.S. 424, 435 (1983). Conversely, if the subsequent motions require interpretation of the Consent Judgment, the proceeding would not share the same common facts and legal theories as the underlying litigation and therefore Coffey's prevailing party status must be redetermined. See Hensley, 461 U.S. at 435; Willie M. v. Hunt, 732 F.2d 383, 386-87 (4th Cir.1984).
 
 
 9
 We review de novo the district court's finding that the Consent Judgment required interpretation. De novo review is appropriate here because the proper construction of a consent judgment is an "issue of law freely reviewable by the court." Willie M. v. Hunt, 657 F.2d 55, 59 (4th Cir.1981).
 
 
 10
 Coffey's motions called upon the district court to enforce the words--"[The County] shall make every reasonable effort" to keep inmate population at the "desirable" level of 177. We believe that these words are not self-executing; they require further interpretation and construction before creating definite duties on the part of the County. The district court was correct in its assessment that these words "neither establish[ ] the capacity of the jail nor set[ ] a population limitation thereon. [The Consent Judgment] contains no agreement that a jail population above 177 inmates violates the [ ] [inmates'] civil rights." Coffey, No. CA-85-1451-CRT-F at 12 n. 2 (E.D.N.C. Oct. 3, 1990). Clearly, before the district court could enforce the imprecise terms of the Consent Judgment, its first step was "the proper construction of [the] disputed provision[s]." Hunt, 732 F.2d at 386. Thus, the duty to litigate over these terms arose "from a failure on the part of Coffey's counsel to formulate a consent judgment that clearly and unambiguously defined" the obligation of the County and from the fact that Coffey's "counsel w[ere] not totally effective in formulating language that was self-executing." Id. at 387.[7] Accordingly, we conclude that the district court correctly found that Coffey did not retain his prevailing party status in the subsequent contempt proceeding. Thus, Coffey's counsel are not entitled to an award of attorneys' fees under § 1988 on a mere finding by the district court that their request was reasonable.
 
 III.
 
 11
 Given that Coffey did not retain his prevailing party status, the next question is whether the district court correctly found that Coffey failed to attain that status in the contempt proceeding itself. Prevailing party status turns on whether Coffey can prove: (i) a causal connection between his enforcement efforts and subsequent action taken by the County to relieve jail overcrowding, and (ii) the receipt of a benefit from the County's actions. Texas St. Teachers Assoc. v. Garland Indep. School Dist., 489 U.S. 782 (1989). To establish a causal nexus, we have said that "the [fee] applicant must show that the lawsuit contributed in a significant way to the winning of benefits or relief from the factual/legal condition that the fee claimant has sought to change." Child v. Spillane, 866 F.2d 691, 693 (4th Cir.1989). Moreover, we have explicitly stated that the causal connection necessary for an award of fees will never be satisfied if plaintiff's action merely "results in the defendant doing no more than it was already committed to do." Id. And we review the district court's finding that Coffey failed to attain prevailing party status in the contempt proceeding itself under a clearly erroneous standard of review because this was an issue of fact decided by the district judge under the appropriate legal principles elucidated above. See Anderson v. Bessemer City, 470 U.S. 564 (1985).
 
 
 12
 These principles applied here lead to the conclusion that the district court properly found that Coffey had not proven a causal connection between the contempt proceeding and the County's penal reform actions.[8] On the evidence presented, the district court was persuaded as a factual matter that the County independently instituted its penal reform measures as the mere continuation of a long range penal reform plan and not in response to Coffey's enforcement motions.
 
 
 13
 In determining that the contempt proceeding did not motivate the County's penal reform actions, the district court drew appropriate inferences from the chronology of events. See Posada v. Lamb County, Texas, 716 F.2d 1066, 1072 (5th Cir.1983) ("the provocative effects of the plaintiffs' legal efforts are ... best gleaned from the chronology of events"); Spencer v. General Elec. Co., 706 F.Supp. 1234, 1238-39 (E.D.Va.1989), aff'd, 894 F.2d 651 (4th Cir.1990) (court used chronology of events to determine whether plaintiff established causal connection). Here, the district court had before it extensive facts dating back almost ten years regarding the County's recognition that the jail population in Wake County would soon outdistance the County's physical resources for incarceration. Additional evidence before the district court indicated that the County planned many of its penal reform measures before Coffey filed his motions.[9] From these facts and the invited inferences, the district court found that Coffey's motions merely "result[ed] in the [County] doing no more that it was already committed to do." Child v. Spillane, 866 F.2d at 693. We cannot say this conclusion is clearly erroneous.
 
 IV.
 
 14
 For the foregoing reasons, we affirm the district court's order in all respects.
 
 
 15
 AFFIRMED.
 
 
 
 [1]
 Wake County and its County Commissioners are hereinafter referred to as the County
 
 
 [2]
 Given the reversion of Center One to a weekend facility, the County rescinded its appropriation for the Center's additional security officers. The County, however, continued funding for additional security positions at the Hammond Road Annex so that more dangerous inmates could be safely housed there and overcrowding at the Wake County Jail could be minimized
 
 
 [3]
 The Home Detention Program places electronic monitoring devices on pre-trial detainees so they can remain at home, pending trial, rather than in jail
 
 
 [4]
 The District Attorney's "Free the People" program was designed to dispose of cases at an expedited hearing, thereby reducing the number of pretrial detainees at a faster rate
 
 
 [5]
 Actions taken by the County after Coffey filed the motions to compel and for contempt include: (i) authorizing funds for the Home Detention Program after receiving a final staff report; (ii) appropriating funds for the district attorney's "Free the People" program; and (iii) adding eighty-six new positions to the Sheriff's department for fiscal year 1990-91, twenty-one of which were to be effective on July 1, 1990. The number of personnel and the effective date were the product of negotiations between the County Manager and the Sheriff in the budget review process
 
 
 [6]
 Title 42 U.S.C. § 1988 provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."
 
 
 [7]
 We also find this case distinguishable from cases cited by Coffey holding that the "reasonable efforts" standard is specific enough to create an enforceable duty. See e.g., Collins Wholesale Distrib. v. E & J Gallo Winery, 867 F.2d 817, 823 (4th Cir.1989) (upholding North Carolina law requiring wineries to "make reasonable efforts to establish and maintain agreements with wholesalers who are females and members of minority groups"); Giancola v. State of W.Va. Dept. of Pub. Safety, 830 F.2d 547, 550 (4th Cir.1987) ("reasonable efforts" standard used to judge legality of officer's actions during search and seizure of marijuana); Swann v. Charlotte-Mecklenburg Bd. of Educ., 431 F.2d 138, 142-43 (4th Cir.1970), aff'd, 402 U.S. 1, 31 (1971) ("every reasonable effort to integrate" created enforceable duty). The district court's ruling does not run afoul of this well-established principle of law. Rather, it holds only that the court must interpret the Consent Judgment before enforcing it because, unlike the cited cases, the Consent Judgment here in issue does not require the County to use every reasonable effort to achieve a definite goal. The Consent Judgment does not establish the capacity of the jail or set a population limit. Instead, it merely requires that the County use "every reasonable effort" to keep the jail population at the "desirable" level of 177 inmates. Thus, as we state above, the district court correctly concluded that the Consent Judgment required interpretation as a predicate to enforcement
 
 
 [8]
 We do not reach the issue of benefits because the district court correctly found no causal connection between Coffey's enforcement efforts and the County's subsequent penal reform actions
 
 
 [9]
 For example, prior to the filing of the motions to compel and for contempt, the County approved funding for additional security positions at Hammond Road Annex so that more dangerous inmates could be housed there. Also prior to Coffey's filing of the contempt motion, the County held discussions about implementing the Home Detention Program and the District Attorney's "Free the People" program. Moreover, during the fall of 1989 and early 1990, the County actively discussed the budget for fiscal year 1990/91, including penal reform measures such as funding for new security officers to maximize use of the Hammond Road Annex and to open a portion of Center One on a full-time basis