In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-3981, 02-3982

ALLIANCE TO END REPRESSION, *et al.*,

*Plaintiffs-Appellees/Cross-Appellants,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellant/Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 74 C 3268, 74 C 3295—**Joan B. Gottschall**, *Judge.*

ARGUED DECEMBER 11, 2003—DECIDED JANUARY 28, 2004

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

POSNER, *Circuit Judge.* In 1974 and 1975, two classes of plaintiffs, represented by the Alliance to End Repression and the American Civil Liberties Union respectively, brought suit under 42 U.S.C. § 1983 against the United States and the City of Chicago. The suit charged that the FBI's Chicago office and the Chicago Police Department's intelligence division were violating the class members' First Amendment rights by overly intrusive and improperly mo-

tivated investigations of alleged subversive activities. In 1981, before a trial could be held, the defendants agreed to a consent decree, which was approved by the district court the following year, imposing detailed restrictions on the defendants' investigative authority. 561 F. Supp. 537 (N.D. Ill. 1982). The decree did not, however, vest monitoring or other responsibilities in the plaintiffs or their lawyers.

In 1997, long after this court had interpreted the decree as imposing fewer restrictions on the FBI than the district court had thought it did, 742 F.2d 1007 (7th Cir. 1984) (en banc), the City asked the district court to modify it to make the restrictions on the City less onerous. The district court refused even though the judge who had approved the decree in the first place had said it was so strict that she wouldn't have awarded the plaintiffs such draconian relief even if they had proved all their allegations in a trial. 561 F. Supp. at 551.

The City appealed from the refusal to modify the decree. It pointed out that it had complied with the decree throughout the entire period of almost two decades in which it had been in force, that during this period the Supreme Court and this court had become ever more emphatic that the federal judiciary must endeavor to return the control of local governmental activities to local government at the earliest possible opportunity compatible with achievement of the objectives of the decree that transferred that control to the federal courts, and that the culture of law enforcement in Chicago and the character of the threats to public safety by ideologically motivated criminals had so far changed as to make much of the decree obsolete. We agreed with the City and ordered that its motion be granted in its entirety. 237 F.3d 799 (7th Cir. 2001). We pointed out that the decree was frustrating the efforts of the police to cope with the problems of today because earlier generations of police had

coped improperly with the problems of yesterday. Because of what the police department's "Red Squad" had done many years ago, the Chicago police would, unless the decree was modified, labor indefinitely under severe handicaps from which other police forces were free. Under the modified decree, which forbids investigations intended to impede freedom of expression and requires the City to commission independent periodic audits to determine the City's compliance, First Amendment rights would, we held, be secure, while under the original decree the public safety was insecure and the prerogatives of local government scorned. And this was before the terrorist attacks on the United States of September 11, 2001, brought about a renewed appreciation of the weight of security considerations in determining the point of balance between safety and liberty that we call our civil liberties.

All this is by way of background to the present appeal (and cross-appeal, in which the ACLU, however, does not join), which is by the City from an award by the district court to the class representatives of more than $1 million in attorneys' fees. That is on top of at least $450,000 in fees awarded (and paid) for legal services rendered earlier in the proceedings; the true figure is undoubtedly higher but the parties' records are incomplete, doubtless because of the great age of the case.

The $1 million award is for the following legal services rendered between 1994 and 2001: two proceedings for contempt of the decree, which failed; the opposition, just described, which also failed, to the modification of the decree; and efforts, which also bore no fruit so far as anyone can say, to monitor the City's compliance with the decree—no fruit, that is, except the failed contempt proceedings. The order is appealable now because the activities for which the fees were awarded are complete in a sense that will become clearer in our discussion of the merits.

The awarding of attorneys' fees under 42 U.S.C. § 1983 is governed by 42 U.S.C. § 1988(b), which authorizes such awards only to the prevailing party. See *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health & Human Resources*, 532 U.S. 598 (2001). The plaintiffs argue that by virtue of obtaining the consent decree in the first place they became the prevailing party for the entire life of the decree (which contains no sunset provision)—indeed, beyond, for they contend that even if the decree had been dissolved in 2001, rather than just being modified, they would be entitled to the legal fees they incurred in opposing that result, provided only that the fees were reasonable in amount and the opposition to dissolution not frivolous. They base this claim primarily on the Supreme Court's decision in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 557-61 (1986), which allowed the reimbursement of attorneys' fees for postjudgment proceedings brought by the plaintiffs' lawyers. But those postjudgment proceedings were at least partly successful. These plaintiffs' postjudgment proceedings were not. They argue that they shouldn't be penalized for failure because they were duty-bound to oppose the modification of the decree, to monitor compliance with the decree before and after it was modified, and to bring contempt proceedings against anyone who they thought might be violating it. In support of the argument they cite our decision in *Ustrak v. Fairman*, 851 F.2d 983, 990 (7th Cir. 1988), where we said that the plaintiff, having won a judgment in the district court, "had no choice" but to incur attorneys' fees to defend the judgment in our court. But in that case, too, the plaintiff was successful—not entirely, but enough to make him the prevailing party. Had he lost on appeal he would not have been entitled to any award of fees.

In only two classes of case governed by section 1988(b) or similar fee-shifting provisions (see *Hensley v. Eckerhart*,

461 U.S. 424, 433 n. 7 (1983)) has a plaintiff who obtained no relief in postdecree proceedings nevertheless been awarded fees for those proceedings. The first class consists of cases in which the consent decree itself authorized the court to award fees to the plaintiff that would be incurred in disputes brought to the court in the wake of the decree. *Plyler v Evatt*, 902 F.2d 273, 276 n. 1, 279 n. 4 (4th Cir. 1990); *Turner v. Orr*, 785 F.2d 1498, 1500 nn. 2, 3 (11th Cir. 1986). The contractual entitlement (there is none in our case) supplemented or superseded the statutory one. Granted, *Plyler* contains language suggesting that the case would probably have been decided the same way without benefit of the decretal provision. Similar dicta can be found in other cases as well, such as *Cody v. Hillard*, 304 F.3d 767, 773 (8th Cir. 2002); *San Francisco NAACP v. San Francisco Unified School District*, 284 F.3d 1163, 1166 (9th Cir. 2002), and *Jenkins v. Missouri*, 127 F.3d 709, 716-19 (8th Cir. 1997). But partly by its approving reference (902 F.2d at 281) to our decision in *Ustrak*, where, to repeat, the plaintiff had some success, and partly by its observing that the plaintiffs had merely not been "successful in detail," *id.*, the court in *Plyler* indicated that it thought the plaintiffs' efforts had contributed to compliance with the decree, and thus had not been fruitless after all. Indeed, the court noted that the defendant hadn't even appealed part of the district court's order in favor of the plaintiffs. *Id.* at 276, 279. This statement may have been erroneous, see *Plyler v. Evatt*, 846 F.2d 208, 210, 215-16 (4th Cir. 1988) (an earlier round, in which the court vacated the district court's order in its entirety), but it shows the court's thinking.

And likewise in *Turner* the court made clear its belief that the postdecree efforts had been valuable in inducing compliance with the decree, even though they, too, had failed in detail. 785 F.2d at 1504; cf. *Bond v. Stanton*, 630 F.2d 1231, 1233-34 (7th Cir. 1980); *Miller v. Carson*, 628 F.2d 346,

347-49 (5th Cir. 1980). These cases can be thought of as extensions of the principle that a plaintiff is not to be denied full attorneys' fees merely because he lost some interim rulings en route to ultimate success. *Jaffee v. Redmond*, 142 F.3d 409, 414 (7th Cir. 1998); *Jenkins v. Missouri, supra*, 127 F.3d at 714-16. Such setbacks are well-nigh inevitable, and a lawyer who nevertheless was sedulous to avoid them might lose a good case through an excess of caution. Likewise in postdecree litigation there may be inevitable setbacks en route to victory, partial or complete. But in the present case there has for a decade now been nothing but loss—a million dollars' worth of legal services poured down the drain. There was not even a disappointing partial success, as there would have been if the City had moved to dissolve the decree and the plaintiffs had fended off dissolution yet had not averted a substantial modification.

In the second and more numerous class of cases, attorneys' fees incurred in efforts to monitor compliance with the consent decree are said or assumed to be compensable even if no postjudgment order results from the efforts. *Eirhart v. Libbey-Owens-Ford Co.*, 996 F.2d 846, 850-51 (7th Cir. 1993); *San Francisco NAACP v. San Francisco Unified School District, supra*, 284 F.3d at 1166; *Joseph A. v. New Mexico Dept. of Human Services*, 28 F.3d 1056, 1059-61 (10th Cir. 1994); *Keith v. Volpe*, 833 F.2d 850, 855-57 (9th Cir. 1987); *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir. 1984); *Northcross v. Board of Education*, 611 F.2d 624, 637 (6th Cir. 1979). These cases are best explained on a deterrence rationale: careful monitoring reduces the likelihood that the decree will be violated. The rationale is attenuated in a case such as this in which someone else—not the plaintiff—is the appointed monitor. More fundamentally, the cases we have cited—all of which except *San Francisco NAACP* precede *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health & Human Resources, supra*, and in *San Francisco NAACP* no fees

were in fact awarded—are inconsistent with the Supreme Court's rejection in *Buckhannon* of the "catalyst" theory of fee-shifting. As may also be such cases as *Plyler*, *Turner*, *Bond*, and *Miller*, insofar as they—though *Plyler* and *Turner* only in dictum, for remember the contractual fee-shifting provisions in those cases—reward lawyers for promoting compliance with the original decree rather than for obtaining supplementary court-ordered relief.

The catalyst idea was that if a lawyer's effort produces a good result albeit not an actual judgment or other judicial relief, it should be compensable. The Court described it as the idea that a fee-shifting statute "allows an award where there is no judicially sanctioned change in the legal relationship of the parties," 532 U.S. at 605—and rejected it. Monitoring may reduce the incidence of violations of a decree, but if it does not produce a judgment or order, then under the rule of *Buckhannon* it is not compensable.

The plaintiffs are left to argue that the fact that the failed proceedings were offshoots of a pending case rather than entirely free-standing lawsuits should make a difference. Some cases have suggested that if postjudgment proceedings are "inextricably intertwined" with the original decree, in the sense of involving the same facts and legal issues, they can be considered part of the original case in which the plaintiff prevailed. *Cody v. Hillard, supra*, 304 F.3d at 773; *Arvinger v. Mayor & City Council of Baltimore*, 31 F.3d 196, 200-02 (4th Cir. 1994). That is a questionable extension of the sound and settled principle that attorneys' fees incurred in interim defeats en route to a successful conclusion are compensable because, as we have noted, such skirmishes are indispensable inputs into a successful conclusion of litigation. Time, however, runs in only one direction. Interim defeats can contribute to ultimate victory, but failed efforts to follow up that victory contribute to nothing.

In any event, the postjudgment proceedings here, coming as they did so many years after the consent decree went into effect, are clearly separable from the proceeding that led up to the entry of the decree. Just as a bankruptcy proceeding provides a venue and procedural framework for prosecuting discrete claims ("adversary proceedings") by and against the debtor—for example, a tort claim by the debtor that were he not in bankruptcy would be prosecuted as a civil suit in state court—so a consent decree will often, and here does, provide a venue and procedural framework for prosecuting discrete claims. For example, persons complaining of violations of the *Shakman* decree (actually decrees, *Shakman v. Democratic Organization of Cook County*, 481 F. Supp. 1315, 1356-59 (N.D. Ill. 1979), vacated under the name *Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987); 569 F. Supp. 177, 183-207 (N.D. Ill. 1983)), which limits patronage practices in employment by the City of Chicago, litigate the violations as contempts of court, see *Smith v. City of Chicago*, 769 F.2d 408, 411-13 (7th Cir. 1985), rather than having to prosecute them as independent suits. That procedural short-cut does not earn a legal fee paid by the City if the claim fails. Ancillary or offshoot proceedings in class actions (such as contempt proceedings under the *Shakman* decree), or in bankruptcy, are treated by the law as if they were independent, free-standing proceedings, see, e.g., *In re James Wilson Associates*, 965 F.2d 160, 166-67 (7th Cir. 1992) (bankruptcy), with the decisions ending the proceedings thus being treated as appealable final decisions. That is one reason why the fee awards that the district court ordered are appealable now rather than only after the decree is dissolved, cf. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 201-03 (1988), if it is ever dissolved—a matter to which we return at the end of this opinion. Another reason for allowing an immediate appeal is that a decree might never *be* dissolved, so that to treat fee awards as interlocutory

might defer appeal to the end of time. *Bogard v. Wright*, 159 F.3d 1060, 1063 (7th Cir. 1998).

We do not think that our plaintiffs would argue that if a member of the class went to a lawyer who does not represent the class, and that lawyer filed a motion for contempt on behalf of his client and lost, the lawyer would be entitled to a fee, on the ground that the class member was a prevailing party by virtue of the consent decree. They would attempt to distinguish the case on the ground that the lawyers who negotiated the decree, or their successors (it has been, after all, more than two decades since the decree was entered), were "duty-bound" to enforce the decree—to monitor it, to file contempt proceedings on the basis of information obtained through the monitoring or otherwise, and to oppose any effort to lift or alter the decree. The attempt would fail. The decree imposes no such duties; nor does the law. The original decree contained provisions for audits and other methods of assuring compliance with the decree that were to be administered by the Chicago Police Board, while the modified decree requires annual audits by the Chicago Police Department and one audit to be performed by a national independent public accounting firm within five years. Neither the original nor the modified decree imposes on these lawyers any duty of operating the compliance machinery. They could have walked away from the case as soon as the consent decree was approved confident that a compliance machinery in which they had been given no role had been established. They would not have been letting down the class had they done so.

This brings out an important difference between this case and *Plyler* and *Turner*. Consider *why* the decrees in those cases but not in this one authorized the award of attorneys' fees for postdecree litigation without requiring that the plaintiffs prevail in that litigation. The answer is that they

must have been expected to be the enforcers of the decree. This is explicit in *Turner*: "the consent judgment provided that the representatives of the plaintiff class would establish the PMC [Plaintiffs' Monitoring Committee, the entity seeking the award of fees] to, as its name suggests, monitor and ensure the continuing enforcement of the consent judgment." 785 F.2d at 1500. The present decree contains no contractual attorneys' fees provision because, rather than the lawyers for the class being the appointed enforcers of compliance with the degree, a public body, the Chicago Police Board, was given that task. We are mindful that some cases have authorized compensation for piggyback monitoring of the type involved in this case, e.g., *Duran v. Carruthers*, 885 F.2d 1492, 1495-97 (10th Cir. 1989); *Keith v. Volpe, supra*, 833 F.2d at 857-58, but they do not survive *Buckhannon*.

We are not suggesting that the lawyers for the class *had* to walk away from the decree once it was entered. But they could not appropriate for themselves a guaranteed lifetime income by bringing and losing a series of actions to enforce the decree and charging the expense to the City and thus to the taxpayers. The class-action device is not intended to be a lawyers' gravy train. The law does not reward lawyers for losing cases, or reimburse them for a prefiling investigation (which is the character of the plaintiffs' monitoring of compliance with the decree) that leads to the filing of a losing suit. The plaintiffs sue and lose, the City defends and wins—but, we are told, the City is to pay its own expenses plus the plaintiffs'. We do not see the sense of that. The plaintiffs argue that unless they are reimbursed when they lose, their incentive to sue will be diminished because there is always a danger of losing a suit. Yes, and if section 1988 said that losing plaintiffs were entitled to awards of attorneys' fees, they would have a good argument.

Their strongest claim is to fees for defending the decree against the modification sought by the City. It is strongest because they were responding rather than initiating and because modification is perhaps not as readily conceptualized as a separate suit adventitiously embedded in the underlying class action as is a proceeding for contempt or what we have characterized as a prefiling investigation. But we reject the claim for three reasons. First, we have conceptualized postdecree litigation, including collection litigation, broadly as a discrete phase analogous to a free-standing suit. *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1224-25 (7th Cir. 1993); *King v. Ionization International, Inc.*, 825 F.2d 1180, 1184-85 (7th Cir. 1987); see *Bogard v. Wright, supra*, 159 F.3d at 1062-63; *In re Joint Eastern & Southern Districts Asbestos Litigation*, 22 F.3d 755, 760-65 (7th Cir. 1994). This does not mean that every procedural order that follows the entry of a consent decree or other judgment requiring continuing supervision is immediately appealable. *Bogard v. Wright, supra*, 159 F.3d at 1062-63; compare *SEC v. Suter*, 832 F.2d 988, 990 (7th Cir. 1987). That would lead to an unmanageable proliferation of appeals. But orders modifying or refusing to modify injunctions are appealable immediately, 28 U.S.C. § 1292(a)(1), and that principle supports treating a proceeding to modify a consent decree as a discrete phase of an otherwise open-ended proceeding.

Second, as we have noted already, the plaintiffs had no duty—statutory, contractual, or ethical—to oppose modification. Third, and further demonstrating the absence of even an ethical duty to oppose their opposition, verged on the unreasonable. The decree had been in force for 15 years when the City asked that it be modified.

> If not limited to reasonable and necessary implementations of federal law, remedies outlined in consent decrees involving state [or, we add, local] officeholders

may improperly deprive future officials of their desig-
nated legislative and executive powers. They may also
lead to federal court oversight of state programs for
long periods of time even absent an ongoing violation
of federal law. . . . Rule 60(b)(5) allows a party to move
for relief if "it is no longer equitable that the judgment
should have prospective application.". . . In *Rufo v.
Inmates of Suffolk County Jail,* 502 U.S. 367 (1992), the
Court explored the application of the Rule to consent
decrees involving institutional reform. The Court noted
that district courts should apply a "flexible standard" to
the modification of consent decrees when a significant
change in facts or law warrants their amendment. *Id.,* at
393.

*Frew v. Hawkins,* No. 02-628, 2004 WL 57266, at *7 (U.S. Jan.
14, 2004). In the present case, the circumstances out of which
the class action suit had arisen had changed dramatically
when modification was sought. The decree in its original
form had accomplished its purpose and had become
obsolete. There would have been no ignominy in the
plaintiffs' acceding to the modification. They might have
breathed a sigh of relief, since if the City had asked that the
decree be dissolved, it probably would have been. The
plaintiffs' opposition to modification gained the class
nothing. Section 1988 does not reward failure. The contrast
with *Plyler* is sharp, where the court described "the position
taken" by the plaintiffs as "essential to the preservation of
the integrity of the consent decree as a whole." 902 F.2d at
281.

Another point and we are done. The fees awarded in this
case are for work dating back to 1994, a dozen years after
the decree had been entered. This suggests the unwisdom
of "conduct," or "regulatory," decrees (that is, equitable
decrees that do not merely tell the defendant not to do or
to stop doing something, but instead regulate his behavior

and so impose a continuing duty of judicial supervision) that contain no sunset provision. Beginning in the Clinton Administration and continuing in the present Administration, the Justice Department and the Federal Trade Commission have both decided to include sunset provisions in their regulatory antitrust decrees. U.S. Dept. of Justice, Antitrust Division, *Antitrust Division Manual* ch. 4, p. 55 (3d ed. 1998); Federal Trade Commission, Final Rule, "Duration of Existing Competition and Consumer Protection Orders," 60 Fed. Reg. 58514, 58515 (Nov. 28, 1995). The absence of such a provision from the decree involved in the present case is, in retrospect, a considerable defect. It has meant that the plaintiffs have been encouraged to pursue enforcement efforts bound to fail because the decree, a response to the turmoil of the Vietnam War era now almost forgotten, is merely a relic.

The *modified* decree has a quasi-sunset provision. It provides that upon the completion of the independent audit that the modified decree orders but in any event no later than 2006, the district judge is to consider whether to dissolve the decree. We urge expedited completion of the audit, to clear the way to a prompt consideration of whether the decree has indeed outlived its usefulness, as in *People Who Care v. Rockford Board of Education*, 171 F.3d 1083, 1090-91 (7th Cir. 1999); 246 F.3d 1073 (7th Cir. 2001). As the Supreme Court reminded us just weeks ago, "The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Frew v. Hawkins, supra*, at *7.

The fee award is reversed. The plaintiffs are entitled to no fees for the legal services rendered during the period in issue, and *a fortiori* the Alliance is not entitled to the additional half million dollars sought in its cross-appeal.

REVERSED.

A true Copy:

      Teste:

                             _____

                             *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*