Gaynell **GRIER**, et al., individually and on behalf of others similarly situated, Plaintiffs,

and

Sanford Bloch, et al., and all others similarly situated, Plaintiffs–Intervenors,

v.

M.D. **GOETZ**, Jr., Commissioner, Tennessee Department of Finance and Administration, et al., Defendants,

and

Tennessee Association of Health Maintenance Organizations, et al., Defendants–Intervenors.

No. 3:79–3107.

United States District Court, M.D. Tennessee, Nashville Division.

March 7, 2006.

Dorothy M. Siemon, Franco Allocco Munoz, Sarah Lenz Lock, A.A.R.P. Foundation Litigation, Washington, DC, Erin E. Oshiro, Petra T. Tasheff, Welfare Law Center, New York, NY, Everette L. Doffermyre, Kimberly Jean Johnson, Ralph I. Knowles, Jr., Doffermyre, Shields, Canfield, Knowles & Devine, Atlanta, GA, George Gordon Bonnyman, Jr., Joseph Michael Engle, Michele M. Johnson, Lisa J. D'Souza, Shawn L. Caster, Tennessee Justice Center, Inc., Nashville, TN, George Edward Barrett, Edmund L. Carey, Jr., Gerald E. Martin, Barrett, Johnston & Parsley, Nashville, TN, for Plaintiffs–Intervenors.

Charles J. Cooper, Derek L. Shaffer, Kathryn L. Wheelbarger, Michael W. Kirk, Nicole J. Moss, Cooper & Kirk, Washington, DC, Charles A. Miller, Covington & Burling, Washington, DC, Linda A. Ross, Steven B. Carter, Sue A. Sheldon, Jennifer Helton Hann, John W. Dalton, Nicholas G. Aemisegger, Jr., Tennessee Attorney General's Office, Nashville, TN, Ronald G. Harris, Aubrey B. Harwell, Jr., Philip D. Irwin, Neal & Harwell, Nashville, TN, for Defendants.

Bobby D. Green, Ashland City, TN, pro se.

Lois Vaughan, Interlachen, FL, pro se.

Gary C. Shockley, John S. Hicks, Lewis R. Donelson, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Nashville, TN, Margaret Mary Huff, Nashville, TN, William Matthew Barrick, William Beesley Hubbard, Hubbard, Berry, Doughty, Harris & Barrick, PLLC, Nashville, TN, John M. Murdock, Epstein, Becker & Green, Washington, DC, Lea C. Owen, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Nashville, TN, Blakeley D. Matthews, Cornelius & Collins, LLP, Nashville, TN, for Defendants–Intervenors.

## MEMORANDUM ORDER

JOHN T. NIXON, Senior District Judge.

Pending before the Court is Plaintiffs' Application For Recovery Of Attorney's Fees And Expenses As A Prevailing Party (Doc. No. 1310), to which Defendants have responded in opposition (Doc. No. 1320).[1]

---

1. Plaintiffs–Intervenors also made an application for recovery of attorney's fees and expenses as a prevailing party. (Doc. No.

Plaintiffs request attorney's fees and expenses for two separate phases of this ongoing litigation: (1) Plaintiffs' monitoring of the State's implementation and enforcement of the 2003 Consent Decree, and (2) Plaintiffs' opposition to Defendants' Motion to Modify and/or Clarify the Consent Decree.

## I. BACKGROUND

On October 1, 2003, this Court approved the Revised Consent Decree (Modified) (the "2003 Consent Decree") that embodied the Plaintiffs' and Defendants' settlement agreement reached after lengthy negotiations earlier that year. (Doc. No. 908.)[2] The 2003 Consent Decree gave Plaintiffs broad authority to monitor Defendants' implementation and enforcement of the Decree. (*Id.* § D.) As a result, Plaintiffs' counsel met regularly over a period of many months with the State to monitor and assist with implementation. (*See* Doc. No. 1310, Att. A, Manny Martins Dep. at 98–99, 102.) These monitoring activities related to the appeals and pharmacy provisions of the 2003 Consent Decree. (*Id.* at 100–02.) The State, in recognition of Plaintiffs' right to conduct monitoring activities, worked collegially with Plaintiffs' counsel to further implementation and enforcement of the 2003 Consent Decree. (*Id.* at 103–05.)

In the meantime, on February 17, 2004, Governor Bredesen announced his plan to restructure TennCare. Seven months later, on September 27, 2004, Defendants filed with the Court the State's Proposed Amendment to the TennCare Demonstration Project, an application that had been submitted to the federal Centers for Medicare and Medicaid Services ("CMS") seeking permission to change the TennCare program in ways that were acknowledged to require modification of the 2003 Consent Decree. (Doc. 939 at 15.) Subsequently, the State proposed to eliminate non-Medicaid eligibility categories and disenroll 430,-000 adults and children from the program. In response, Plaintiff's counsel unilaterally moved for temporary modification of the 2003 Consent Decree. (Doc. No. 963.) Defendants rejected this temporary modification. (Doc. No. 972.) Eight months after that, on June 6, 2005, Defendants filed a notice with the Court stating that CMS had partially approved the State's request for a TennCare waiver amendment. (Doc. No. 1076.) On June 15, 2005, Defendants moved to modify and/or clarify the 2003 Consent Decree to implement the changes approved by CMS. (Doc. No. 1086.) The motion contained twenty requests for modification and/or clarification of the 2003 Consent Decree, a number of which contained several subparts for a total of thirty-four requests. On June 27, 2005, Plaintiffs responded primarily in opposition to Defendants' motion to modify, but also noted requests to which they did not object. (Doc. No. 1111.)

---

1313.) Before the Court could rule on the prevailing party issue, however, Plaintiffs–Intervenors and Defendants reached an agreement and Defendants agreed to pay Plaintiffs–Intervenors approximately $1.3 million in attorney's fees and expenses. (Doc. No. 1324.) Accordingly, Plaintiffs–Intervenors' application for recovery of attorney's fees and expenses is **MOOT**.

**2.** Section E of the 2003 Consent Decree provided that Plaintiffs were "prevailing parties for purposes of their entitlement to attorneys' fees under 42 U.S.C. § 1988 for legal services rendered by their counsel in connection with these proceedings." (Doc. No. 908 § E at 39.) On January 29, 2004, Plaintiffs' counsel filed their application for an award of attorneys' fees with a memorandum and declarations in support. (Doc. Nos. 912–923.) On March 11, 2004, the parties negotiated and reached a resolution of the attorneys' fees to be awarded (Doc. No. 927), and the Court entered an order awarding fees and costs to Plaintiffs' counsel on March 18, 2004. (Doc. No. 928.)

After a three week trial, the Court issued orders on July 28, July 29, August 3, and August 9, 2005 granting in part and denying in part Defendants' motion. (Doc. Nos. 1246, 1248, 1256, 1261.) The Court issued its memorandum opinion on November 15, 2005 explaining the reasons underlying its previous orders. (Doc. No. 1282.) Out of Defendants' thirty-four requests for modification, the Court granted five without limitation. (*See* Doc. No. 1256 at 8, 12, 14–15 (granting Defendants' requests (e), (f), (g), (m), and (s)).) Out of these five, Plaintiffs did not object to requests (e), (f) and (s). (Doc. No. 1240 at 79, 93.) For the remaining twenty-nine requests—the vast majority—the Court either granted the requests with several limitations or denied them in their entirety. (*See* Doc. No. 1256.) Nevertheless, Defendants claim that the "Court's order granted substantially all of the modifications that the State requested.... Simply put, the State prevailed ... and plaintiffs lost." (Doc. No. 1320 at 8.) Much to the Court's displeasure, it is not that simple. A brief summary of the Court's previous rulings demonstrates that neither party is a clear winner or loser in this case.

- (a) The State requested authorization to implement *all* the reforms approved by CMS, *including, but not limited to,* those approved in CMS' letters of March 24, 2005 and June 8, 2005. The Court granted this request in part, by permitting the State to implement the reforms already approved by CMS, *subject to the Court's ruling* on the compatibility of the reforms with the 2003 Consent Decree and federal law. Further, the Court denied the request in part by prohibiting implementation of future CMS-approved reforms that are inconsistent with the 2003 Consent Decree, as revised. This is the very ruling that Plaintiffs re-

quested. (Doc. Nos. 1111 at 2, 1240 at 74.)

- (b) The State requested authorization to "require prior authorization by the TennCare Bureau as a condition of coverage for any drug or drug class so designated by the State...." Plaintiffs agreed that the State could already require such prior authorization under the 2003 Consent Decree. (Doc. No. 1111 at 2.) In granting this request, the Court simply reaffirmed the plain language of the 2003 Consent Decree. (Doc. No. 1282 at 42–43.) The State also requested authorization to deny reimbursement for drugs lacking the prior authorization. Over Plaintiffs's objection, the Court partially granted this request, but limited the situations in which the State could categorically deny reimbursement.

- (c) This request, which sought the implementation of a five-prescription-per-month limit, was heavily contested. In opposing this request, Plaintiffs strongly advocated the use of a "soft," as opposed to a "hard," limit. While ultimately granting this request in its entirety, the Court did so with the expectation that the State would move quickly to implement a "soft" limit rather than the "hard" limit proposed in the request. (Doc. No. 1256 at 4.) Indeed, this Court specifically requested the State's oral assurance during closing argument that a "soft" limit would be implemented. (Doc. No. 1247, Tr. at 10–11; Doc. No. 1282 at 55; *see also* Doc. No. 1150, Tr. at 203–05.) In addition, the Court continues to expect the State to "submit with its proposed revisions to the 2003 Consent Decree, evidence that it has sought approval from CMS to imple-

ment a 'soft' five-prescription-per-month limit." (Doc. No. 1282 at 62.).

- (d) This request dealt with five different aspects of the appeals process in the context of a denial of prior authorization. The Court granted most of the requests, but imposed certain limitations. (Doc. No. 1256 at 4–8.) Defendants now claim this as a significant victory, but ignore the fact that Plaintiffs did not object to many aspects of the State's request. (*See* Doc. No. 1240 at 76–77 (concurring with the State on subparts (1) and (3), and aspects of subpart (2)).) Further, the limitations that the Court imposed on the State's broad requests were derived from Plaintiff's position. (*Compare* Doc. No. 1256 at 4–8, *with* Doc. No. 1240 at 76–77.) In fact, the Court only granted one subpart regarding valid factual disputes in its entirety over Plaintiffs' objection. (Doc. No. 1256 ¶ (iv)(5) at 8). But even with this request, the Court explained that what constitutes a "valid factual dispute" during individualized determinations would necessarily be broad, and that it would be "the rare case indeed that is dismissed for failure to raise a 'valid factual dispute.'" (Doc. No. 1282 at 77–78.) Finally, the Court denied one of the State's most important requests, and held that a valid appeal may be taken where no prior authorization has been sought. (Doc. No. 1256 ¶ (iv)(4) at 7.) While the Court, over Plaintiffs' objection, later permitted the State to implement a less onerous administrative procedure to deal with such appeals, it did so only because the parties forced it to "delve into the minutiae of practical solutions." The principle of the Court's ruling on this aspect, however, was in Plaintiffs' favor. (Doc. No. 1261 at 2–5.)

- (e) The State sought authorization to control the content of the formulary and designate the drugs that would be available without prior authorization. Plaintiffs did not object to this request, arguing that the 2003 Consent Decree already permitted the State to do exactly that, and the Court agreed. (*Compare* Doc. Nos. 1256 ¶ (v) at 8, 1282 at 43 *with* Doc. No. 1240 at 79.)

- (f) The State sought authorization to exclude coverage for any over-the-counter drug. Plaintiffs did not object to this request. (Doc. No. 1240 at 79.) The Court granted this request, but recommended that a "soft," as opposed to a "hard," exclusion be implemented. (Doc. Nos. 1256 ¶ (vi) at 8, 1282 at 62.)

- (g) This request dealt with a 72–hour emergency supply for drugs requiring, but lacking, prior authorization. The Court granted this request in its entirety over Plaintiffs' strenuous objections. (Doc. Nos. 1256 ¶ (vii), 1282 at 45–52.)

- (h) This request, which had six subparts, dealt with the implementation of benefit limits and the appeals process. Over Plaintiffs' objection, the Court permitted the State to implement "hard" benefit limits, but it recommended a "soft" benefit limit propounded by Plaintiffs, and permitted the State to deny appeals arising from benefit limits that do not raise valid factual disputes. (Doc. No. 1256 ¶¶ (viii)(1), (6) at 9–10.) Plaintiffs did not object to subparts (2), (3) and (5) of this request (Doc. No. 1240 at 82–83), which the Court granted with certain limitations (Doc. No. 1256 ¶¶ (viii)(2), (3), (5) at 9–10). The

Court denied subpart (4) and over Defendants' objections required notice after a provider's refusal to render a requested service due to a benefit limit. (Doc. No. 1256 ¶ (viii)(4) at 9–10.)

- (i) This request, which had four subparts, dealt with the imposition of co-payments and appeals thereto. Plaintiffs did not object to the imposition of co-payments, arguing that the 2003 Consent Decree did not prevent the State from imposing such fees, and the Court agreed, but reminded the State of the contours of federal law regarding co-payments. (*Compare* Doc. Nos. 1256 ¶ (ix)(1) at 10, 1282 at 54, *with* Doc. No. 1240 at 84.) The remaining three subparts were contested. The Court granted, over Plaintiffs' objections, the State's request to dismiss an appeal regarding co-payments that do not raise a valid factual dispute. (Doc. No. 1256 ¶ (ix)(3) at 10.) The Court, however, denied the State's request to deny services where a co-payment has not been paid, as well as its request not to provide notice when a provider refuses to render a service as a result of an enrollee's failure to pay a co-payment. (Doc. No. 1256 at ¶ (ix)(2), (4).)

- (j) This request dealt with appeals of service denials that also raise eligibility category challenges. The Court granted this request in part and denied it in part, after considering Plaintiffs' objections and fashioning an alternative solution. (*Compare* Doc. No. 1256 ¶ (x) at 11, *with* Doc. No. 1240 at 86.)

- (k) Agreeing with Plaintiffs' objections, the Court denied the State's request to dismiss an appeal without providing a hearing when the enroll-

ee never requested the item or service sought in the appeal from the MCC in the first instance or when the item or service sought has not been ordered or prescribed by a provider. (Doc. No. 1256 ¶ (xi) at 11.) In order to reduce the State's administrative burden, the Court permitted the State to create an administrative grievance or other informal process to resolve the appeals prior to granting a hearing. (*Id.*) The principle of the Court's ruling on this aspect, however, was in Plaintiffs' favor.

- (*l*) The State requested authority to rely upon all relevant information, not just the enrollee's medical records, in determining TennCare coverage of medical services and in considering and deciding medical appeals. Plaintiffs did not object to this modification, and the Court granted it noting that Paragraph C(7)(b) of the 2003 Consent Decree already permitted the State to do what it requested. (*Compare* Doc. Nos. 1256 ¶ (xii) at 11–12, 1282 at 84, *with* Doc. No. 1240 at 87–88.) Furthermore, the Court denied the State's request to delete Paragraph C(7) of the 2003 Consent Decree. (Doc. No. 1256 ¶ (xii) at 12.)

- (m) Over Plaintiffs' objections, the Court granted the State's request to create a screening process to identify appeals that are not based upon a valid factual dispute. (Doc. No. 1256 ¶ (xiii) at 12.)

- (n) The State requested the authority to place the burden of proof in all medical appeals upon the enrollee. Plaintiffs did not object to this request, arguing that state law already permitted the State to do exactly that, and the Court agreed. (*Compare* Doc. Nos. 1256 ¶ (xiv) at 12,

1282 at 86–89, *with* Doc. No. 1240 at 89.) As the Court previously noted, the State's underlying concern was with the "burden of proving medical necessity of a service in cases involving 'clinical judgment,'" which the Court addressed by permitting a revision of the first sentence of Paragraph C(7). In allowing this revision, the Court alleviated the State's concern regarding the weight afforded a treating physician's unsupported opinion, and addressed Plaintiffs' concern regarding the State's attempt to unilaterally overrule a treating physician's reasonably supported opinion. (Doc. Nos. 1256 ¶ (xii) at 11–12, 1282 at 86–89.)

- (o) Over the Plaintiffs' objection, the Court granted the State's request to appeal a medical appeal decision rendered at any stage of the process in favor of the enrollee. Nevertheless, the Court noted several limitations that the State would face in implementing this request. (Doc. No. 1282 at 90–92; *see also* Doc. No. 1328 at 5–7.)

- (p) The State requested broad authority to modify the time limitations for filing and resolving medical appeals, and limit expedited appeals. While the Court permitted the State to revise the time required to gather relevant records from physicians and MCCs in the context of expedited appeals, it did not permit the State to *greatly* exceed the thirty-one-day limit to resolve expedited appeals. (Doc. Nos. 1256 ¶ (xvi) at 13–14, 1282 at 92–99) (emphasis added). Importantly, the Court declined to modify the timing requirements for standard appeals. (*Id.*) Further, the Court, agreeing with Plaintiffs' objections, did not permit the State to modify the standard for expedited appeals, but simply permitted the State to

revise the appeals form. (*Id.*) Altogether, these are minor changes in comparison to the broad changes that the State requested.

- (q) The State requested the authority to remedy defects in a required notice or a missed appeal deadline. The Court, over Plaintiffs' objections, permitted the State to do so, but limited the State to remedy such defects in the early stages of an appeal. (Doc. Nos. 1256 ¶ (xvii), 1282 at 99–101; *see also* Doc. No. 1328 at 7–11.)

- (r) This request dealt with the definition of medical necessity. Plaintiffs did not object to the State's authority to deny a claim for a service that the State concluded was not medically necessary, nor did they object to the fact that the State, and not a provider, has the ultimate authority to determine whether a service is medically necessary. (Doc. No. 1240 at 92–93.) Plaintiffs objected to the statutory definition of medical necessity in the event it conflicted with Paragraphs C(4) and C(7) of the 2003 Consent Decree. (*Id.*) The Court clarified that the State's proposed definition of medical necessity did not conflict with these paragraphs. (Doc. No. 1256 ¶ (xvii) at 14, 1282 at 89–90.)

- (s) The State requested the authority to implement a set of geographic and/or clinical hardship criteria to determine when enrollees would be allowed to transfer between MCCs outside of defined open enrollment periods. Plaintiffs did not object to this request, arguing that the 2003 Consent Decree already permitted the State to do exactly that, and the Court agreed. (*Compare* Doc. Nos. 1256 ¶ (xix) at 14, 1282 at 101, *with* Doc. No. 1240 at 93.)

- (t) The State requested the addition of a termination clause to the 2003 Consent Decree. The Court agreed with Plaintiffs and categorically denied this request. (Doc. Nos. 1256 ¶ (xx) at 15, 1282 at 102–05.)

In short, both Plaintiffs and Defendants achieved some success and suffered some losses.

## II. ANALYSIS

Pursuant to 42 U.S.C. § 1988(b), in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." Section 1988(b) authorizes an award of fees to a prevailing party in cases such as the present one that are brought under 42 U.S.C. § 1983. *Maher v. Gagne,* 448 U.S. 122, 124, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). The purpose of this fee-shifting statute is to "ensure effective access to the judicial process for persons with civil rights grievances." *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

An award of attorney's fees in this case turns on four issues: (1) whether the success Plaintiffs achieved is sufficient to obtain "prevailing party" status; (2) whether attorney's fees and expenses may be awarded for the partially successful defense of a consent decree; (3) whether attorney's fees may be awarded for monitoring work performed by Plaintiffs after the entry of the 2003 Consent Decree; and (4) what constitutes a "reasonable" award of attorney's fees and expenses for a partially prevailing party and for successful monitoring work.

### A. Plaintiffs Are A Partially Prevailing Party For Purposes Of Attorney's Fees

The key to recovery of attorney's fees is whether the party seeking fees is a "prevailing" party. The Supreme Court has held that a "prevailing" party is one that receives at least *some* relief on the merits of its claim. *Hanrahan v. Hampton,* 446 U.S. 754, 758, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) ("[O]nly 'when a party has prevailed on the merits of at least some of his claims . . . has there been a determination of the "substantial rights of the parties." ' "). Thus, it is well-settled that a plaintiff will be considered a prevailing party "for attorney's fees purposes if [the plaintiff] succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit. This is a generous formulation that brings the plaintiff only across the statutory threshold. It remains for the district court to determine what fee is 'reasonable.' " *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933 (citations omitted). Accordingly, although a plaintiff need not succeed on all claims, a plaintiff must receive at least some relief on the merits before the plaintiff can be said to prevail. *Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987).

The Supreme Court reaffirmed this standard in *Texas State Teachers Ass'n v. Garland Independent School District,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), adding that the "touchstone of the prevailing party inquiry must be the material alteration of the legal relationship . . . the degree of plaintiff's overall success goes to the reasonableness of the award . . . not to the availability of a fee award *vel non.*" Importantly, in reaffirming this standard, the *Garland* Court decisively rejected the more difficult standard that certain Circuits had adopted requiring plaintiffs to succeed on the "central issue" of the case and obtain the "primary relief sought." *Id.* at 790, 109 S.Ct. 1486. Most recently, the Supreme Court again reaffirmed the validity of the "generous" standard, which requires a prevailing par-

ty to receive some relief on the merits of its claim. *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Res.*, 532 U.S. 598, 603–04, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001).

▇ Defendants argue that Plaintiffs do not meet this generous statutory threshold because the only claim before the Court was whether modification of the 2003 Consent Decree was permitted, and as the Court answered that question in the affirmative, Defendants prevailed. In other words, Defendants appear to argue that because Plaintiffs did not succeed in preventing all the modifications Defendants' requested, they achieved no benefit from their opposition to Defendants' motion to modify and should be denied an award of attorney's fees. In order to obtain prevailing party status, however, Plaintiffs are not required to succeed in preventing all modifications, they are only required to succeed in preventing *some* modifications. *See Buckhannon*, 532 U.S. at 603–04, 121 S.Ct. 1835.[3]

As the recitation of facts demonstrates, the Court permitted certain of Defendants' modifications, denied others, and limited yet others. With these mixed results, neither party can claim clear victory. Furthermore, there is no doubt that Plaintiffs succeeded on various significant issues, and achieved some of the benefit they sought in opposing Defendants' motion to modify.

Importantly, in their request (t) Defendants requested that the 2003 Consent Decree should terminate in 2007. The Court emphatically denied this request because the Court found that the Decree contained the "most robust due process rights for Plaintiffs," the "healthiest due process protections" to date, and these protections were "essential" to Plaintiffs. (Doc. No. 1282 at 104.) This was a significant issue from which Plaintiffs achieved considerable benefit because it protected the essence of their court-approved bargain with the State. This alone is sufficient for the Plaintiffs to obtain "prevailing" party status under the Supreme Court's generous formulation.

As noted above, however, Plaintiffs obtained *some* benefit on essentially all of Defendants' requests except request (g) regarding an emergency supply of a drug lacking the requisite prior authorization, and request (m) regarding screening of appeals. *See supra* at 1065, 1066. First, the Plaintiffs obtained a significant benefit from this Court's partial denial of request (a). The Court denied Defendants the authority to implement all reforms permitted by CMS without first seeking the Court's approval unless the reforms are not inconsistent with the 2003 Consent Decree, as revised. Granting such permission would have divested the Court of the ability to enforce the 2003 Consent Decree and stripped the Plaintiffs of the valuable protections guaranteed by the Decree. Second, there is no question that Plaintiffs prevented Defendants from introducing sweeping modifications to the appeals process. *See supra* at 1064 – 68 (noting partial denials of requests (b), (d), (h), (i), (j), (k), (*l*), (n), (o), (p), (q), (r) regarding

---

**3.** In addition, there is a two-part standard for modification of a consent decree that first requires analysis of whether modification is permitted and second requires analysis of whether the proposed modifications are suitably tailored to the circumstances. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Defendants were required to prevail on *both* prongs; simply prevailing on the first prong was not sufficient to obtain modification of the 2003 Consent Decree. The Court also notes that even on the first prong, the Court rejected all but one of Defendants' arguments. (Doc. No. 1282 at 15–36.)

changes to the appeals process.) It is worth remembering that this lawsuit began because the State violated federal notice and hearing requirements. The 2003 Consent Decree lists in detail the notice and hearing procedures that the State must follow. (*See* Doc. No. 908.) That Plaintiffs successfully defended against changes to these notice and hearing procedures is a significant benefit because they were successful in preserving the essence of their initial bargain. Third, even on requests (c), (f), and (h) regarding limits on prescription drugs, over-the-counter drugs, and benefits, respectively, Plaintiffs' voice was heard and the Court elicited a promise from the State that it would in the future introduce the "soft" limits that Plaintiffs had requested. *See supra* at 1064 – 65. Overall, Plaintiffs succeeded on numerous significant issues and achieved some of the benefit they sought in opposing Defendants' motion. For purposes of attorney's fees, therefore, Plaintiffs are a prevailing party, albeit a partially prevailing one.

### B. THE SUCCESSFUL DEFENSE OF A CONSENT DECREE CAN FORM A BASIS FOR ATTORNEY'S FEES

■ In addition to obtaining "some" relief on the merits, the Supreme Court recently clarified that "relief" on the merits requires a "court-ordered" change, or some sort of "judicial imprimatur" that alters, the parties' legal relationship. *Buckhannon*, 532 U.S. at 604–05, 121 S.Ct. 1835 (citing *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). A judgment on the merits or a settlement agreement enforced through a consent decree constitutes a court-ordered alteration in the parties' legal relationship. *Id.; Maher*, 448 at 129–30, 100 S.Ct. 2570. A voluntary change in a defendant's behavior, "although perhaps accomplishing what the plaintiff sought to achieve by the law-

suit, lacks the necessary judicial *imprimatur* on the change," and will not be a basis for recovery of attorney's fees. *Buckhannon*, 532 U.S. at 605, 121 S.Ct. 1835 (emphasis in original).

Defendants assert that Plaintiffs are not entitled to attorney's fees because there has been no "alteration in the legal relationship of the parties." Defendants argue that "[a]ll the relief awarded were changes sought by the State and opposed by Plaintiffs. Plaintiffs did not obtain *any* new relief. The most Plaintiffs can say is that the State did not receive every last item of relief requested in the motion." (Doc. No. 1320 at 9–10) (emphasis in original). In short, Defendants argue that even where Plaintiffs were successful in preventing a modification, they did not "prevail" because maintaining provisions of the 2003 Consent Decree did not alter the parties' legal relationship. This argument boils down to the proposition that even if the Court had denied Defendants' requests in their *entirety*, Plaintiffs still would not have "prevailed" because they were simply maintaining the status quo. Or, in another formulation, a plaintiff who initially obtains relief through a court-approved consent decree may *never* receive "prevailing party" status for later *successfully* defending the consent decree because the legal relationship has not changed. Defendants' proposition is unsupported by the law.

#### 1. The Successful Defense Of A Consent Decree Has The Requisite Judicial Imprimatur

As the Supreme Court has noted, a party will have prevailed if it *vindicates its rights through* a consent judgment. *Maher*, 448 U.S. at 129, 100 S.Ct. 2570 (quoting S.Rep. No. 94–1011, at 5 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5908, 5912). This seminal Supreme Court case does not distinguish between, on the one hand, initially *obtaining* a consent judgment or, on the other hand, *defending* a

previously obtained consent judgment. *Maher* only requires a party to vindicate its rights *through* a consent judgment. *Id.* A vindication of such rights may be done by successfully obtaining *or* successfully defending a consent decree. Recently, the Supreme Court expressly adopted *Maher.* See *Buckhannon,* 532 U.S. at 604, 121 S.Ct. 1835. While Justice Scalia doubted whether he would adopt the same rule if the issue were to arise for the first time today, he joined the majority in affirming the continuing vitality of *Maher. Id.* at 618–19, 121 S.Ct. 1835 (Scalia, J., concurring). Importantly, in explaining why consent decrees as opposed to private settlements formed the basis for attorney's fees, Justice Scalia noted:

> [I]n the case of court-approved settlements and consent decrees, even if there has been no judicial determination of the merits, the outcome is at least the product of, and bears the sanction of, judicial action *in the lawsuit.* There is at least *some* basis for saying that the party favored by the settlement or decree prevailed *in the suit.* Extending the holding of *Maher* to a case in which no judicial action whatever has been taken stretches the term "prevailing party" ... beyond what the normal meaning of that term in the litigation context can conceivably support.

*Id.* (emphasis in original). In contrast to obtaining a consent decree which only requires judicial *approval,* the successful defense of a consent decree requires a "judicial *determination* of the merits" and clearly "bears the sanction of[ ] *judicial*

*action* in the lawsuit." *Id.* (emphasis added and altered). Thus, there can be no doubt that obtaining—after a full trial on the merits—a judgment that declines to modify a previously-issued-court-approved consent decree has all the ingredients of "judicial imprimatur" required to warrant an award of attorney's fees.

Further, the issue in *Buckhannon* was whether a plaintiff is "entitled to attorney's fees under the 'catalyst theory,' which posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." 532 U.S. at 601, 121 S.Ct. 1835. Thus, *Buckhannon* only dealt with the narrow issue of whether a defendant's voluntary change in behavior *before* a court has considered and ruled on the merits of the lawsuit could result in prevailing party status for the plaintiff. *Id. Buckhannon* does not discuss post-judgment or post-consent-decree litigation. Indeed, Justice Scalia's concurring opinion is particularly illuminating that the Supreme Court was focusing on *pre-judgment* changes in legal relationships. He states that one cannot be considered a "prevailing party" if one leaves "the courthouse emptyhanded." *Id.* at 614, 121 S.Ct. 1835. Similarly, a "judicial finding of liability [is] an understood requirement of 'prevailing.'" *Id.* Unlike a defendant's pre-judgment voluntary change in conduct, when a plaintiff successfully defends a consent decree he or she cannot be said to have left the "courthouse emptyhanded;" on the contrary, he or she has obtained a "judicial finding."[4]

4. Justice Scalia's other examples of the traditional meaning of a "prevailing party" also demonstrate that the Court was focusing its attention on pre-judgment activity:

> [A "prevailing party" is] the party that wins the suit or obtains a finding (or an admission of liability). Not the party that ultimately gets his way because his adversary dies before the suit comes to judgment;

> not the party that gets his way because circumstances so change that a victory on the legal point for the other side turns out to be a practical victory for him; and not the party that gets his way because the other side ceases (for whatever reason) its offensive conduct.

*Id.* at 615, 121 S.Ct. 1835 (J. Scalia concurring).

*2. The Successful Defense Of A Consent Decree Maintains The Original Change In The Parties' Legal Relationship*

Defendants' argument that there has been no material alteration in the parties' legal relationship is a red herring. The crux of this argument lies in the timing of the alteration in the legal relationship. Defendants concede that an alteration occurred in 2003 when the Consent Decree was approved by this Court, but argue that maintaining the Decree does not lead to a *new* alteration. As there is no *new* alteration in the relationship, Plaintiffs' cannot be considered a "prevailing party" for an award of attorney's fees.

*Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County, Tennessee,* 421 F.3d 417 (6th Cir.2005) is instructive about when the alteration in the legal relationship must occur. In *Deja Vu,* the Sixth Circuit held that the entry of a *permanent* injunction *after* the entry of a *preliminary* injunction "qualifies as an enforceable judgment on the merits of the case that 'materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiffs.'" 421 F.3d at 420. In that case, the plaintiffs filed a motion for injunctive relief, which the district court awarded in the form of a preliminary injunction. *Id.* at 419. That injunction was dissolved due to changes in the law. *Id.* Plaintiffs filed a second motion for a preliminary injunction, which was granted and made permanent shortly thereafter. *Id.* The district court awarded attorney's fees for plaintiffs' success in obtaining the *preliminary* injunction *and* their success in obtaining the *permanent* injunction. *Id.* The Sixth Circuit affirmed the award of attorney's fees on the basis that the *"net* result of the litigation was the entry of a permanent injunction barring enforcement

of Chapter 6.54." *Id.* (emphasis added). Essentially, *Deja Vu* teaches that a preliminary injunction that is later converted to a permanent injunction constitutes a material alteration in the parties' legal relationship in a way that directly benefits the plaintiffs *even though there is no "alteration" in the parties' relationship from the time of entry of the preliminary injunction to the time of entry of the permanent injunction.* The "net result" is important, not the initial timing of the material alteration of the parties' legal relationship.

In the present case, the "net result" of the litigation is the continued enforcement of many aspects of the 2003 Consent Decree. Even though the material alteration in the legal relationship initially occurred in 2003, that alteration is enforced to this day. Moreover, the Court specifically declined to modify or limit modification of certain provisions of the 2003 Consent Decree to prevent Defendants from returning to pre–2003 Consent Decree activity. (*See* Doc. No. 1282 at 79–83 (declining to eliminate appeals without a prescription); 101 (stating that issuance of a third revised notice would "permit the State and its contractors to revert to practices this Court previously found impermissible."); 104 ("the temptation to reduce [the protections in the 2003 Consent Decree] ... is strong, as has been demonstrated by this litigation.").) Therefore, in this case, not only did the Court maintain the validity of the 2003 Consent Decree, but it did so because it recognized that the conditions that led to the Decree still exist, and the protections of the Decree continue to be "essential." (*Id.* at 104.)

Importantly, the Supreme Court in requiring an "alteration" in the parties' legal relationship was attempting to distinguish between a defendant's voluntary change in conduct and a defendant's involuntary change in conduct as a direct result of a court's order. *Buckhannon,* 532 U.S. at

605, 121 S.Ct. 1835. In this case it could not be more clear that Defendants' conduct would be very different if they were not required to continue to comply with the 2003 Consent Decree. Indeed, Governor Bredesen recently stated that Tenn-Care "still remains seriously constrained by consent decrees," implying that Defendants would not provide Plaintiffs the protections contained in the 2003 Consent Decree if this Court had not required them to do so. Remarks: Governor Bredesen's 2006 State of the State Address, http://www.tennessee.gov/governor/viewArticleContent.do?id=736 (last visited Feb. 20, 2006.) This is certainly not the type of "voluntary" change that the Court was discussing in *Buckhannon*.

### 3. Alliance Does Not Foreclose An Award Of Attorney's Fees For The Successful Defense Of A Consent Decree

Defendants argue that the only post-*Buckhannon* case squarely addressing the issue of whether a partially successful defense of a consent decree may be the basis for an award of attorney's fees foreclosed such an award. *See Alliance to End Repression v. City of Chicago*, 356 F.3d 767 (7th Cir.2004). Defendants are incorrect.

*Alliance* discussed two separate issues: (1) whether a wholly unsuccessful defense of a consent decree could form the basis for an award of attorney's fees, and (2) whether a plaintiff who succeeds in obtaining a consent decree can receive attorney's fees for post-decree monitoring when the consent decree is silent on the issue. *Id.* at 769. The Seventh Circuit stated that after *Buckhannon*, post-decree monitoring may not be compensable when the consent decree does not provide an explicit provision for the award of attorney's fees for

monitoring, thereby answering the second question in the negative. *Id.* at 771.[5]

The Seventh Circuit, however, did not hold, or even state in dicta, that *Buckhannon* precluded attorney's fees for a partially successful defense of a consent decree. *Id.* at 769–70, 773–74. Rather, the Seventh Circuit took pains to note other cases in which a partially successful defense of a consent decree formed the basis for an award of attorney's fees. *Id.* at 769 (citing *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air*, 478 U.S. 546, 557–61, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), *Ustrak v. Fairman*, 851 F.2d 983, 990 (7th Cir.1988)). Without discussing their post-*Buckhannon* validity, the Seventh Circuit held that those cases did not apply because those plaintiffs *had partially succeeded* on the merits, whereas the plaintiffs before it had utterly failed on the merits. *Id.* As can be seen from the following remarks, the Seventh Circuit's holding was based on the plaintiffs' lack of success, and not on *Buckhannon:*

> But those postjudgment proceedings were at least partly successful. These plaintiffs' postjudgment proceedings were not.
>
> . . .
>
> But in the present case there has for a decade now been nothing but loss—a million dollars' worth of legal services poured down the drain. *There was not even a disappointing partial success, as there would have been if the [Defendant] had moved to dissolve the decree and the plaintiffs had fended off dissolution yet had not averted a substantial modification.*
>
> . . .
>
> the decree in its original form had accomplished its purpose and had become *obsolete....* The plaintiffs' opposition

---

**5.** More on the issue of fees for monitoring activities later, but suffice it to say at this point that this Court is not bound by the Seventh Circuit, nor does it agree with the Seventh Circuit's reasoning as set forth in section II.C, *infra*.

to modification *gained the class nothing. Section 1988 does not reward failure. Id.* at 769–70, 774 (emphasis added).

Setting the *Alliance* plaintiffs' failure aside, the Seventh Circuit went on to comment that plaintiffs' strongest claim was to fees for defending the decree against modification. *Id.* at 773. Ultimately, the Seventh Circuit denied these fees for three reasons particular to the case—none of which included the holding of *Buckhannon. Id.* at 773–74. This Court declines to extend *Alliance's* holding to the present case, which has a distinctly different set of facts because Plaintiffs were partially successful in defending the 2003 Consent Decree.

### 4. Post-Buckhannon Cases Permit An Award Of Attorney's Fees For The Successful Defense Of A Consent Decree

Defendants' assert that *Alliance* is the only post-*Buckhannon* case that squarely addresses the issue of whether a partially successful defense of a consent decree may be the basis for an award of attorney's fees. Defendants' are incorrect. There are other cases which have addressed this issue and have come to the opposite conclusion than the one reached by the Seventh Circuit in *Alliance.*

The Eighth Circuit awarded attorney's fees to the plaintiff for the partially successful defense of the consent decree in *Cody v. Hillard,* 304 F.3d 767, 775 (8th Cir.2002). There the court found no conflict between *Buckhannon* and the award of post-judgment attorney's fees. Rather, it found that the entry of a consent decree twelve years prior to the defendant's motion to dissolve the consent decree was "clearly a 'judicially sanctioned change' in the parties' relationship that conferred prevailing party status on the class under *Buckhannon." Id.* at 773 (citations omit-

ted). The Eighth Circuit noted, however, that having established prevailing party status immediately after the entry of a consent decree "does not make all later work compensable." *Id.* Instead,

> [A]n earlier established prevailing party status extends to postjudgment work only if it is 'a necessary adjunc[t] to the initial litigation.' Work that is more 'like a new, separate lawsuit' requires a fresh determination of entitlement to fees. The test is whether the later issues litigated were 'inextricably intertwined with those on which the plaintiff prevailed in the underlying suit.'

*Id.* (citations omitted). Finally, the court stated that "work done to defend a remedy for a constitutional violation is inextricably intertwined with the litigation that yielded that remedy.... *When a remedial consent decree is threatened, 'plaintiffs' counsel [are] under clear obligation to make the defensive effort.'* " *Id.* at 775 (citations omitted); *but cf. Alliance,* 356 F.3d at 773 (finding "plaintiffs had no duty—statutory, contractual, or ethical—to oppose modification.").

This post-*Buckhannon* analysis is substantially similar to pre-*Buckhannon* analysis by the Fourth Circuit in *Plyler v. Evatt,* 902 F.2d 273, 280–81 (4th Cir.1990). In *Plyler,* the Fourth Circuit held that once a party has achieved "prevailing party" status in obtaining the consent decree, the extension of that status to post-decree litigation depends on the relatedness of the later proceedings with the initial action. *Id.* at 280. Thus, a plaintiff who engages in post-decree litigation that is "essential to the preservation of the integrity of the consent decree as a whole" or responds to post-decree litigation to preserve the "fruits" of the consent decree will be entitled to "prevailing party" status whether the plaintiff is successful in detail or not. *Id.* at 281.[6]

---

**6.** Defendants argue that the consent decree in

*Plyler* contained an express provision award-

Similarly, in *Barcia v. Sitkin*, No. 79 Civ. 5831, 2005 WL 1606038, at *2 (S.D.N.Y. July 7, 2005) the defendants argued that there was no "enforceable alteration of the legal relationship between the parties," even though the plaintiffs successfully opposed defendants' motion to end monitoring. Defendants asserted that "'warding off' a cross-motion does not transmogrify plaintiffs into prevailing parties, as they have not prevailed on the merits of their claims or changed the legal relationship between the parties." *Id.* The district court rejected defendants' argument and held that plaintiffs obtained prevailing party status because they

obtained an enforceable judgment that requires defendants to bring the manner in which they conduct hearings into compliance with the consent judgment. The judgment, *and the ability to enforce it,* has altered the legal relationship between the parties and forbids the defendants from arbitrarily depriving claimants who do not appeal their cases from receiving the benefits of the consent judgment. Thus, the legal relationship between the plaintiffs and the defendants ... [has] been sufficiently altered to regard plaintiffs as prevailing parties thereby justifying the awarding of attorney's fees.

*Id.* (emphasis added).

Finally, in *Gautreaux v. Chicago Housing Authority*, No. 66 C 1459, 2005 WL 1910849, at *1 (N.D.Ill. Aug. 9, 2005) the district court awarded attorney's fees for post-judgment activity. The *Gautreaux* court, which incidentally is bound by the

Seventh Circuit, declined to follow *Alliance* after noting that *Alliance* was based on "contempt and modification proceedings that were 'clearly separable' from the entry of the consent decree." *Id.* at *1. The *Gautreaux* court found:

Unlike *Alliance*, this case involves post-judgment work and proceedings that are all part of one active equitable case, in which compliance has always been at issue, and modifications and clarifications of the original judgment order must continuously be made to account for changing conditions and circumstances.

*Id.* at *2.

The Court finds that these post-*Buckhannon* cases (*Cody, Barcia, Gautreaux*) demonstrate the continuing validity of pre-*Buckhannon* cases such as *Plyler* for the proposition that the successful defense of a consent decree can form the basis of an award for attorney's fees.[7]

■ Applying the principles from these cases, the Court finds that Plaintiffs in this case should be awarded attorney's fees for their partially successful defense of the 2003 Consent Decree. In this case, Plaintiffs response to Defendants' motion to modify was required because Defendants' motion threatened to destroy the 2003 Consent Decree, which Plaintiffs had obtained to remedy Defendants' constitutional violations. *See Cody*, 304 F.3d at 773, 775. Plaintiffs efforts were "essential to the preservation of the integrity of the consent decree as a whole." *Plyler*, 902 F.2d at 281. As Plaintiffs were partially

---

ing the *Plyler* plaintiffs post-judgment attorney's fees. That is true regarding post-judgment monitoring fees, but not regarding fees for post-judgment litigation, including defending the consent decree, which were left to the court's discretion. *Plyler*, 902 F.2d at 276 n. 1 ("Plaintiffs' costs and attorneys' fees incurred in the submission of any dispute to the Court following entry of this Decree shall be

paid by Defendants *upon the Court's determination* that Plaintiffs are entitled to costs and fees." (emphasis added)).

7. While these courts may also award attorney's fees for the unsuccessful defense of a consent decree, this Court need not address that issue as Plaintiffs were partially successful.

successful in preserving the "fruits" of the 2003 Consent Decree, they are entitled to "prevailing party" status. *Id.*

### C. PLAINTIFFS ARE ENTITLED TO POST-JUDGMENT MONITORING FEES AND EXPENSES

■ Plaintiffs also seek to recover fees and expenses for monitoring Defendants' implementation of and compliance with the 2003 Consent Decree. "[P]ostjudgment monitoring of a consent decree is a compensable activity for which counsel is entitled to a reasonable fee." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 559, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (citing, among others, *Northcross v. Board of Ed. of Memphis City Sch.,* 611 F.2d 624, 637 (6th Cir.1979)). In *Delaware Valley,* the consent decree did not provide for attorney's fees for post-decree monitoring, but the Supreme Court nevertheless awarded plaintiffs attorney's fees for monitoring defendants performance under the consent decree. 478 U.S. at 550, 558–59, 106 S.Ct. 3088. The Court reasoned:

> [T]he work done by counsel in [the monitoring phase] . . . was *as necessary* to the attainment of adequate relief for their client *as was all of their earlier work* in the courtroom which secured . . . [the] initial success in obtaining the consent decree. This case did not involve a single tortious act by the [defendant] that resulted in a discrete injury to [the plaintiff], nor was the harm alleged the kind that could be remedied by a mere award of damages or the entry of declaratory relief. Instead, [the plaintiff] filed suit to force the [defendant] to comply with its obligations under the Clean Air Act to develop and implement an emissions inspection and maintenance program covering 10 counties surrounding two major metropolitan areas.
>
> . . .
>
> *Protection of the full scope of relief* afforded by the consent decree was thus *crucial* to safeguard the interests asserted by [the plaintiff]. . . . In a case of *this kind,* measures necessary to enforce the remedy ordered by the District Court *cannot be divorced* from the matters upon which [the plaintiff] prevailed in securing the consent decree.

*Id.* at 558–59, 106 S.Ct. 3088 (emphasis added). Thus, the Court held that when post-decree monitoring work protects the relief awarded under the consent decree, ensures compliance with the decree, or is critical to the vindication of the plaintiffs' rights under the consent decree, compensation for the activity is proper and within the trial court's discretion. *Id.* at 561, 106 S.Ct. 3088; *see also Northcross,* 611 F.2d at 637 ("Services devoted to reasonable monitoring of the court's decrees, both to insure full compliance and to ensure that the plan is indeed working . . ., are compensable services. *They are essential* to the long-term success of the plaintiff's suit.") (emphasis added).

Defendants assert, however, that pursuant to *Buckhannon* and *Alliance,* post-decree monitoring fees and expenses are unrecoverable. *Buckhannon* does not discuss post-judgment monitoring fees. Rather, it rejected awarding attorney's fees to plaintiffs who succeeded in achieving a desired result through a voluntary (as opposed to a court-ordered) change in defendants' conduct. 532 U.S. at 604–06, 121 S.Ct. 1835. Nevertheless, Defendants, as did the Seventh Circuit in *Alliance,* liken changes in a defendant's conduct as a result of a plaintiff's post-decree monitoring to the pre-judgment "voluntary" changes in a defendant's conduct that *Buckhannon* discussed. Defendants ask this Court to adopt the Seventh Circuit's interpretation and deny an award for post-decree monitoring fees.

In *Alliance,* the Seventh Circuit stated that an award of attorney's fees for post-decree monitoring would be inconsistent with *Buckhannon* because such an award would "reward lawyers for promoting compliance with the original decree rather than for obtaining supplementary court-ordered relief." 356 F.3d at 771. The Seventh Circuit unnecessarily imposes the requirement of obtaining *supplementary* court-ordered relief after a party has obtained a consent decree. *Buckhannon,* as already explained in-depth, focuses on pre- as opposed to post-judgment activity. 532 U.S. at 604–06, 614–20, 121 S.Ct. 1835 (Scalia, J., concurring). Thus, it simply does not address the issue of attorney's fees for post-judgment activity nor does it explicitly impose the requirement of obtaining supplementary relief from a court once a consent decree has been obtained.

In addition, according to the Seventh Circuit post-decree monitoring is based on a "deterrence rationale." *Alliance,* 356 F.3d at 771. That is, "careful monitoring reduces the likelihood that the decree will be violated." *Id.* In the Seventh Circuit's view, its "deterrence rationale" was essentially the same as the "catalyst" theory, which the Supreme Court rejected. While it is true that post-decree monitoring may lead to fewer violations of a consent decree, the Seventh Circuit wholly ignores the fact that post-decree monitoring also assists in implementing a consent decree. Analytically this distinction is important because under the "deterrence rationale" changes in a defendant's conduct due to plaintiff's post-decree monitoring may be confused with the type of "voluntary" behavior that *Buckhannon* disdains. Under an "implementation rationale," however, changes in a defendant's conduct as a re-

sult of plaintiff's post-decree monitoring are not "voluntary," as the term is used in *Buckhannon,* but are "required" by a previously-issued-court-approved decree. Therefore, when plaintiff's monitoring efforts are successful, they should be rewarded.

Moreover, cases involving consent decrees often deal with violations of federal law by state defendants for which there are no easy solutions (such as school desegregation, discrimination, and in this case due process requirements in the health care context). The consent decrees provide guidelines, sometimes detailed, that attempt to remedy these violations. Practical solutions to ever-changing fiscal, legal and factual realities are difficult to fashion in one document at one point in time, and monitoring by plaintiff's counsel reduces the need for a court to waste precious judicial resources in dealing with the minutiae of implementation and enforcement. Indeed, the events after the recent hearing in this case are particularly instructive. After issuing its orders and memorandum opinion, the Court has been barraged by requests for clarification because the parties are unable to implement the Court's broader orders. The Court shudders to think what would happen if it adopted the Seventh Circuit's rule: contempt motions would be filed for every minute implementation and enforcement issue that arises from—it bears repeating—a *previously-issued-court-approved* decree. For these reasons, this Court is not convinced that *Buckhannon's* rejection of the "catalyst" theory extends to post-decree monitoring activities.[8]

Finally, while the Seventh Circuit sweepingly declared that pre-*Buckhannon*

8. It is also worth repeating: The *Alliance* plaintiffs were *wholly unsuccessful* in their monitoring activities, while Plaintiffs in this case were successful in assisting the State's implementation efforts and the State appreciated the Plaintiffs' monitoring work. *See supra* at 1063.

1078

cases granting post-judgment monitoring fees from the First, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth and Eleventh Circuits may be inconsistent with *Buckhannon, id.* at 770–71,[9] it was curiously silent about the pre-*Buckhannon* Supreme Court case *Delaware Valley,* 478 U.S. at 557–61, 106 S.Ct. 3088, which explicitly granted post-judgment monitoring fees.

Unlike the Seventh Circuit, a district court in the Northern District of California dealt with the potential conflict between *Buckhannon* and *Delaware Valley. See Burt v. County of Contra Costa,* Civ. No. C–73–0906 MHP, 2001 WL 1135433, at *9 n. 11 (N.D.Cal. Aug. 20, 2001). The district court in *Burt* came to exactly the opposite conclusion than the Seventh Circuit, stating:

> *Buckhannon* arguably requires that there be some additional judicial intervention associated with monitoring beyond the consent decree itself. This Court rejects that argument, however, on the basis that it would unjustifiably extend *Buckhannon* and would be inconsistent with existing Supreme Court precedent.... [T]he Supreme Court in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air* held that a prevailing party under the Clean Air Act was entitled to fees for work on a related administrative proceeding following entry. of a consent decree. 478 U.S. at 558, 106 S.Ct. 3088. There is no suggestion in *Buckhannon* that the Court intended to overturn its prior precedent on this issue. To the contrary, the distinction drawn by the Court in *Buckhannon* between private settlements and consent decrees, and, in particular the

reference to the 'judicial approval and oversight' of the latter implicitly affirms the reasoning of the Court in *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air.* [*Buckhannon,* 532 U.S. at 604 n. 7, 121 S.Ct. 1835.] Therefore, this Court concludes that the cases holding that a prevailing party may be awarded fees for reasonable monitoring of a court-approved consent decree—with or without subsequent judicial intervention—remain good law.

*Id.; see also Cody v. Hillard,* 304 F.3d 767, 773 (8th Cir.2002) (granting post-judgment monitoring fees without mentioning any conflict between *Buckhannon* and *Delaware Valley,* both of which were cited in the opinion).

Similarly, a post-*Buckhannon* case in the Southern District of New York, basing its decision on the very cases that the Seventh Circuit casually implied were overruled, held that "case law and the plain language of 42 U.S.C. § 1988 clearly state that attorney's fees can be awarded for post-judgment monitoring and other efforts to ensure compliance with the court orders in a civil rights case." *Barcia,* 2005 WL 1606038, at *3.

This Court finds the reasoning of these post-*Buckhannon* cases to be more persuasive than the unnecessary extension of *Buckhannon,* and the naive view that defendants will fully implement and comply with consent decrees without any monitoring by plaintiffs, that the Seventh Circuit propounds. Importantly, while this Court is not bound by the Seventh Circuit, it is still bound to *Delaware Valley,* which the Court believes continues to be good law, as

**9.** *See Garrity v. Sununu,* 752 F.2d 727, 738–39 (1st Cir.1984); *Plyler v. Evatt,* 902 F.2d 273, 276 n. 1, 279 n. 4 (4th Cir.1990); *Miller v. Carson,* 628 F.2d 346, 347–49 (5th Cir.1980); *Northcross v. Board of Educ.,* 611 F.2d 624, 637 (6th Cir.1979), *Bond v. Stanton,* 630 F.2d 1231, 1233–34 (7th Cir.1980); *Eirhart v. Lib-* *bey–Owens–Ford Co.,* 996 F.2d 846, 850–51 (7th Cir.1993); *Keith v. Volpe,* 833 F.2d 850, 855–57 (9th Cir.1987); *Joseph A. v. New Mexico Dep't of Human Servs.,* 28 F.3d 1056, 1059–61 (10th Cir.1994); *Turner v. Orr,* 785 F.2d 1498, 1500 nn. 2, 3 (11th Cir.1986).

well as the Sixth Circuit's ruling in *Northcross v. Board of Ed. of Memphis City Sch.*, 611 F.2d 624, 637 (6th Cir.1979). As such, Plaintiffs' are entitled to reasonable attorney's fees for their work in monitoring and enforcing the 2003 Consent Decree.

■ Monitoring fees are warranted in this case because it is a complicated case, marred by a history of the State failing to comply with the various iterations of the consent decree. As in *Delaware Valley*, this case did not involve a single tortious act by Defendants resulting in discrete injury to Plaintiffs. Rather, it involved systematic constitutional violations that required institutional changes in order to ensure compliance with the 2003 Consent Decree. As a result, Plaintiffs' post-decree monitoring work was essential in preserving their initial success in obtaining the 2003 Consent Decree. Moreover, in this case, Defendants acknowledged that the information provided to the State by Plaintiffs' counsel was helpful with implementation of the 2003 Consent Decree. (Doc. No. 1310, Att. A, Manny Martins Dep. at 105–06.) The Court agrees with Plaintiffs that it "would have been both naive and simplistic to have expected implementation of the extensive due process safeguards required under the 2003 Consent Decree without accountability." (Doc. No. 1310 at 8.)

Finally, Defendants argue that Plaintiffs should not be awarded monitoring fees because the 2003 Consent Decree vests primary responsibility for monitoring and enforcing compliance with the State, secondary responsibility with the Comptroller of the Treasury, and no responsibility with the Plaintiffs. (*See* Doc. No. 908 § D.1–2.) While it is true that Defendants and the Comptroller of the Treasury have significant monitoring and compliance responsibility, the 2003 Consent Decree expressly provides for detailed post-decree monitoring work by Plaintiffs. That is, Plaintiffs are entitled to obtain reports regarding the TennCare appeal process or compliance with any aspect of the 2003 Consent Decree (*id.* § D.3); to receive notices, policy memoranda, training materials, audit tools and protocols, proposed and final rules, or proposed waiver revisions or clarifications affecting the Decree (*id.* § D.4); to inspect documents for purposes of monitoring compliance (*id.* § D.5); and to conduct inspections reasonably necessary to monitor Defendants' compliance (*id.* § D.7). Explicit and implicit language of section D of the 2003 Consent Decree makes clear that Plaintiffs retained the right to monitor compliance, and Defendants recognized such right. Thus, Plaintiffs are entitled to attorney's fees for their monitoring activities related to the 2003 Consent Decree.

## D. REASONABLE ATTORNEY'S FEES FOR PARTIALLY PREVAILING PARTY

While both parties briefed the issue of what would constitute "reasonable" attorney's fees in this case, the Court finds such a discussion to be premature because it has not received Plaintiffs' affidavits detailing the amount of fees and expenses requested. Upon receipt of these affidavits, which the Court previously ordered should be submitted fifteen days after this Court's approval of the revised Consent Decree (Doc. No. 1296), the Court will determine what constitutes "reasonable" attorney's fees.

In closing, the Court finds it appropriate to offer the same advice to the parties as Judge Cohn of the Eastern District of Michigan:

Attorney fee petitions have the tendency to take on a life of their own. The Court has already expended a significant amount of time on this case. The parties are strongly encouraged to agree on

a reasonable amount of attorneys' fees and costs and submit a proposed final judgment consistent with this order.

*AutoAlliance Int'l Inc. v. United States Customs Serv.*, 300 F.Supp.2d 509, 516 (E.D.Mich.2004).

## III. CONCLUSION

The Court **HOLDS** that Plaintiffs' counsel are entitled to reasonable attorney's fees and expenses for (1) partially prevailing in defending and revising the 2003 Consent Decree, and (2) successfully monitoring implementation and enforcement of the 2003 Consent Decree. The Court **RESERVES** ruling on the issue of what constitutes "reasonable" attorney's fees.

It is so ORDERED.